Christopher M. STEVENS, Appellant
(Petitioner Below),

v.

STATE of Indiana, Appellee
(Respondent Below).

No. 79S00–9804–PD–00250.

Supreme Court of Indiana.

June 26, 2002.

jury's recommendation, the trial court ordered the death sentence. This Court affirmed the conviction and sentence on direct appeal. *Stevens v. State,* 691 N.E.2d 412 (Ind.1997), *cert. denied,* 525 U.S. 1021, 119 S.Ct. 550, 142 L.Ed.2d 457 (1998). The defendant thereafter petitioned for post-conviction relief. After extensive proceedings and the presentation of evidence, the post-conviction court denied his petition. He now appeals from the denial of post-conviction relief. The factual details of the offense are detailed in our opinion on direct appeal. *Id.* at 416–420. We affirm the denial of post-conviction relief.

The defendant enumerates seven issues presented for review. We regroup them as follows: (1) ineffective assistance of trial counsel; (2) governmental interference with the right to counsel; (3) ineffective assistance of appellate counsel; (4) unreliability and unconstitutionality of the death sentence; (5) incomplete, unfair, and biased post-conviction relief adjudication.

Defendants who have exhausted the direct appeal process may challenge the correctness of their convictions and sentences by filing a post-conviction petition. *Langley v. State,* 256 Ind. 199, 203, 267 N.E.2d 538, 540 (1971). Post-conviction proceedings are civil proceedings, and a defendant must establish his claims by a preponderance of the evidence. *Ben–Yisrayl v. State,* 738 N.E.2d 253, 258 (Ind. 2000). Because the defendant is now appealing from a negative judgment, to the extent his appeal turns on factual issues, he must convince this Court that the evidence as a whole leads unerringly and unmistakably to a decision opposite that reached by the post-conviction court. *See Timberlake v. State,* 753 N.E.2d 591, 597 (Ind.2001). In other words, the defendant must convince this Court that there is *no* way within the law that the court below could have reached the decision it did.

Susan K. Carpenter, Public Defender of Indiana, Thomas C. Hinesley, Deputy Public Defender, Barbara S. Blackman, Deputy Public Defender, Indianapolis, IN, Attorneys for Appellant.

Karen Freeman–Wilson, Attorney General of Indiana, Andrew L. Hedges, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## ON APPEAL FROM THE DENIAL OF POST–CONVICTION RELIEF

DICKSON, Justice.

In 1995, Christopher M. Stevens was convicted of the 1993 murder of ten-year-old Zachary Snider. In accord with the

*Spranger v. State,* 650 N.E.2d 1117, 1120 (Ind.1995). We do not defer to the post-conviction court's legal conclusions, but do accept its factual findings unless they are "clearly erroneous." Ind.Trial Rule 52(A); *Conner v. State,* 711 N.E.2d 1238, 1245 (Ind.1999); *State v. Van Cleave,* 674 N.E.2d 1293, 1295–96 (Ind.1996), *reh'g granted in part,* 681 N.E.2d 181 (Ind. 1997). As we recently stated in *Timberlake:*

.Post-conviction procedures do not afford a petitioner with a super-appeal; and not all issues are available. *Rouster v. State,* 705 N.E.2d 999, 1003 (Ind.1999). Rather, subsequent collateral challenges to convictions must be based on grounds enumerated in the post-conviction rules. P–C.R. 1(1); *Rouster,* 705 N.E.2d at 1003. If an issue was known and available but not raised on direct appeal, it is waived. *Rouster,* 705 N.E.2d at 1003. If it was raised on appeal, but decided adversely, it is res judicata. *Id.* (citing *Lowery v. State,* 640 N.E.2d 1031, 1037 (Ind.1994)). If not raised on direct appeal, a claim of ineffective assistance of trial counsel is properly presented in a post-conviction proceeding. *Woods v. State,* 701 N.E.2d 1208,1215, [1220] (Ind. 1998). A claim of ineffective assistance of appellate counsel is also an appropriate issue for post-conviction review. As a general rule, however, most freestanding claims of error are not available in a post-conviction proceeding because of the doctrines of waiver and res judicata.

753 N.E.2d at 597–98. Furthermore, any "[i]ssues not raised in the petition for post-conviction relief may not be raised for the first time on post-conviction appeal." *Allen v. State,* 749 N.E.2d 1158, 1171 (Ind.2001)(citing Ind.Post–Conviction Rule 1(8)("All grounds for relief available to a petitioner under this rule must be raised in his original petition.")); *Howard v. State,* 467 N.E.2d 1, 2 (Ind.1984)("It is well set-tled that issues which are not raised either at the trial level, on appeal, or in a post-conviction petition are waived.").

### 1. Ineffective Assistance of Trial Counsel

The defendant contends that deficiencies in his trial representation created a reasonable probability that the results of both the guilt phase and sentencing phase would have been different. In this appeal, he asserts numerous claims of alleged errors of trial counsel.

■ To succeed before the fact finder on his claim of ineffective assistance of counsel, the defendant needed to prove by a preponderance of the evidence not only that his trial counsel's representation fell below an objective standard of reasonableness, but also that his counsels' errors were so serious as to deprive him of a fair trial because of a reasonable probability that, but for counsel's unprofessional errors, the result would have been different. *See Bell v. Cone,* —— U.S. ——, 122 S.Ct. 1843, 1846, 152 L.Ed.2d 914 (2002); *Williams v. Taylor,* 529 U.S. 362, 390, 120 S.Ct. 1495, 1511, 146 L.Ed.2d 389, 416 (2000); *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984); *Woods v. State,* 701 N.E.2d 1208, 1224 (Ind.1998). A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698. In determining whether a defendant proves his claim of ineffective assistance of counsel, the fact-finding court is guided by various important guidelines. There is a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id.* at 690, 104 S.Ct. at 2066, 80 L.Ed.2d at 695. Counsel is afforded considerable discretion in choos-

ing strategy and tactics, and these decisions are entitled to deferential review. *Id.* at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694. Isolated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render representation ineffective. *Perez v. State,* 748 N.E.2d 853, 854 (Ind.2001); *Timberlake,* 753 N.E.2d at 603.

### a. Inadequate Investigation

The defendant first asserts that his two attorneys at trial failed to conduct a reasonable investigation into the facts and the law of his case. He alleges that they failed to timely begin their investigation, to pursue indicated avenues of investigation, to determine necessary expert consultation, to adequately pursue funding for experts and investigation, and to competently hire and assess the one mental health expert they did hire. The defendant asserts that his trial counsel failed to develop a coherent theory of the case that was legally and factually supported and inherently consistent across the guilt and penalty phases. He maintains that, had his counsel conducted a reasonable investigation, they would have uncovered evidence of his mental illness and substance abuse relevant both to the guilt and penalty phases of his trial.

The post-conviction court concluded that defense counsel "adequately investigated the facts and law related to the guilt phase of [the defendant's] trial," Record [1] at 710, and that counsel were "not ineffective for failing to timely seek and secure necessary and appropriate investigative and expert assistance during the trial." *Id.*

The defendant was represented at trial by two attorneys who were found to meet the heightened criteria of experience and training required for appointment in capital cases.[2] Trial Record at 59. They confronted a significant challenge. The defendant had admitted to a family member that he killed Zachary Snider and disclosed where he had concealed the body. After his arrest, the defendant admitted in a videotaped confession that he had repeatedly molested the ten-year old boy and then killed him, first attempting to do so by suffocating him with a pillow, then by strangling him with a cord, and finally by suffocating him by wrapping a trash bag over his head. This crime occurred while the defendant was on probation for a prior conviction of child molesting.

The defendant's trial attorneys sought and obtained funds to hire a mitigation investigator, fact investigator, paralegal, and psychologist, and all billings were ordered sealed. The mitigation investigator had served as a sentencing consultant and mitigation investigator for nine years prior to the defendant's trial and had completed the Indiana Public Defender Council's death penalty mitigation training course. The psychologist, Dr. Lawrence Lennon, examined Stevens and later testified for the defense during the penalty phase of the trial. Dr. Lennon had been recommended by the mitigation investigator. Other members of the criminal defense community also told Stevens's attorneys that Dr. Lennon had done a "very nice job" in testifying in another death penalty case. Dr. Lennon holds a Ph.D. in clinical Psychology from Miami University in Ohio. He was a psychology professor at St. Joseph's College, where he spent four years as the chair of the Psychology De-

**1.** This opinion uses the designation "Record" to apply to the record of the post-conviction proceedings. The original trial record is designated as "Trial Record." "Supp. Record" refers to the supplemental record of the post-conviction proceedings.

**2.** Ind.Crim. Rule 24(B).

partment, and was clinical director of the Child and Adolescent Psychiatric Center at Humana Hospital in Indianapolis from 1991 to 1994. Dr. Lennon conducted a preliminary evaluation of the defendant prior to April 13, 1994 and met with him five times from June through December 1994. Dr. Lennon also met with the defendant's parents and siblings, and reviewed school records, records from the Hamilton Center, and arrest records. Other individuals from Dr. Lennon's office, including a social worker and another psychologist, participated in evaluations of the defendant. Defense counsel considered Dr. Lennon a good fit because of his expertise in treating children and adolescents, and the defendant's attorneys sought and received a transcript of Dr. Lennon's testimony in a case the attorneys felt had similar issues. The defendant's trial counsel sought discovery and filed multiple pretrial motions and supporting briefs, including motions to suppress, motions in limine, motions to dismiss, and a motion for change of venue.

■ The defendant claims, in part, that his counsel unreasonably delayed their investigation. Stevens was tried for murder in January 1995, within seventeen months of his arrest in July 1993. Defense counsel entered their appearances in August 1993. In November 1993 counsel made their first request for funding for experts. This request was granted in May 1994 along with funds for an investigator.[3] Funding for mitigation investigation was secured in January 1994, and a mitigation specialist joined the defense. Defense counsel periodically requested additional amounts for the mitigation, fact, and expert witnesses. Such funding requests were approved. Billing records indicate that information was being gathered, procedural issues were being worked out with the prosecutor and the court, and research was being done on legal issues during the three months before the first funding request. Supp. Record at 25–29. Because of successful motions for continuance, Stevens was not tried until seven months after the time counsel added the psychologist and the fact investigator to their team of a paralegal and mitigation investigator. These facts do not compel a finding of deficient performance in the timing of trial counsel's investigation.

The defendant also asserts that his counsel unreasonably limited their investigation of the defendant's substance abuse and mental illness, foreclosing the development of a viable defense and mitigation strategy based on his mental disease and the effects of his substance abuse in favor of a defense unsupported by the law or the facts and a mitigation case that was of very low weight. He challenges the postconviction court's finding that counsel were "not ineffective for failing to hire a toxicologist to offer expert testimony about Petitioner's use of drugs or alcohol." Record at 716. Similarly, the defendant also asserts that his counsel failed to adequately investigate his mental illnesses and investigate the possibility of mental disease or defect as a defense or mitigation. Specifically, he claims that his counsel "did not retain a consultant on mental health issues, seek a variety of expert mental health opinions, or even acquaint themselves with the forensic approach of the one expert they retained."[4] Br. of Petitioner–Appellant at 26.

---

**3.** Part of the reason for the delay was the determination of the defendant's request that the hearing be *ex parte*. *See infra* Part 2(b).

**4.** The defendant also faults his trial counsel for providing a copy of Dr. Lennon's report to the State prior to trial. We note, however, that the report was provided in compliance with the trial court's order that "any reports

■ During the guilt phase trial, the defense strategy was to urge that the killing was done in sudden heat and thus, if the defendant were guilty, he was guilty of voluntary manslaughter and not murder. At post-conviction, defense counsel testified that this was one of the alternative theories they had been considering from "day one," and when Stevens's confession was not suppressed, voluntary manslaughter became the theory of the case. Record at 2511–12. Counsel based this theory on a statement in the defendant's confession that he "snapped" or "went off." Record at 2512. Defense counsel tendered an instruction on voluntary manslaughter, which the trial court refused to give. During closing argument, defense counsel nevertheless asked the jury to return a verdict of voluntary manslaughter.

While the defendant argues in retrospect that a mental illness defense would have been more effective, his proposed avenue was not without its pitfalls. The post-conviction court noted that, had defense counsel pursued this defense, they would have opened the door to the admission of substantial incriminating evidence not otherwise presented during the guilt phase. This evidence included testimony of a witness that, upon the defendant's prior release from jail onto probation for a

previous conviction of child molesting, the defendant had declared that he planned to kill his next child molesting victim to avoid returning to jail. The trial court determined that defense counsel adequately investigated issues of substance abuse and mental illness and reasonably chose to pursue a different strategy.[5] The post-conviction court did not err in denying relief on this claim.

**b. Deficient Preparation for and Performance at Trial**

Enumerating numerous specific instances of claimed deficiencies, the defendant contends that his trial counsel provided constitutionally ineffective assistance in their preparation for and performance at the guilt, penalty, and sentencing phases of his trial.

*(1) Voluntariness of Confession*

■ The defendant argues that his lawyers failed to competently litigate the reliability and voluntariness of his confession to police. He asserts that his counsel could have argued that he "disassociated during the police interrogation" and exhibited other signs of mental illness that should have been raised in the motion to

---

from experts are to be submitted to the State sixty (60) days in advance of trial." Record at 299. On motion of the defense, the trial court extended the deadline for the exchange of reports from experts to July 19, 1994. Record at 343. The defense thereafter supplied the report.

5. The post-conviction court concluded, in part:

With the benefit of hindsight, Petitioner's present counsel suggest that trial counsel should have adopted the defense of mental disease or defect (Ind.Code § 35–41–3–6) and should have presented psychiatric evidence that Petitioner was unable to form the *mens rea* necessary to commit intentional murder. However, if Petitioner had

raised the insanity defense, he would have opened the door to the admission of incriminating evidence that was not presented during the guilty [sic] phase of his trial.... Moreover, the facts of the crime itself militate against insanity.... Against this backdrop, Dr. Coons's testimony that, in his opinion, Petitioner's ability to appreciate the wrongfulness of his conduct was "impaired" would have had little or no effect on the jury's verdict, particularly in light of Dr. Coons's acknowledgement that Petitioner could appreciate the wrongfulness of his conduct when he took steps to hide Zachary's body.

Record at 713–718.

suppress and in asking the jury to find the confession unreliable.

■ One of the defendant's post-conviction witnesses, Dr. Phillip Coons, gave his opinion that there were at least two times when the defendant was dissociating during his confession. The post-conviction court acknowledged this testimony, but the court concluded that the defendant had presented no evidence of coercive police acts and therefore had not proven the predicate to finding a confession not voluntary. Record at 722. In our opinion on direct appeal, we rejected the defendant's claim that his confession was involuntary, noting:

> Finally, review of the videotape clearly indicates no elements of coercion. The entire interview lasted about an hour. Instead of showing overbearing officers soliciting short, "yes/no" responses from a broken, harassed, tired suspect, the tape shows non-threatening police officers asking general questions of Stevens, and then an alert responsive Stevens supplying long, detailed narrative.

*Stevens*, 691 N.E.2d at 424. To the extent that the defendant's post-conviction claim on this issue is not be foreclosed by *res judicata*, it is governed by the principle that a defendant's claimed mental condition does not render a confession involuntary absent coercive police conduct. *See Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473, 484 (1986)(holding that even when defendant's mental condition is questioned, coercive police conduct is a predicate to finding a defendant's confession involuntary); *Pettiford v. State*, 619 N.E.2d 925, 928 (Ind.1993)("Although a person's mental condition is relevant to the issue of susceptibility to police coercion, where the person voluntarily makes a confession without police coercion the confession may be considered in spite of the mental condition."). We find that there is no reasonable probability that the trial court would have suppressed the confession even had defense counsel presented all the evidence presented at the post-conviction proceedings, nor is it reasonably probable that the jury's assessment of the defendant's confession would have been affected by this testimony. The post-conviction court did not err in denying relief on this claim.

*(2) Venue Change*

■ The defendant contends that he was prejudiced by his counsel's deficient performance when they failed to seek a second change of venue. Upon motion of defense counsel, the case was removed from Putnam County, where the crime was committed, and venued to Tippecanoe County, two counties north of Putnam County. The defendant now argues that both counties are within the Indianapolis media market,[6] that his counsel had no strategic reason to keep the case in Tippecanoe County, and that the failure to seek a second change of venue prejudiced him by denying him his right to a trial by an impartial jury.

The post-conviction court found that defense counsel were not ineffective for failing to make a second motion for a change of venue due to pretrial publicity. The court found that, given the inherent newsworthiness of the case, media coverage would have been prevalent anywhere and although the coverage was at times extensive it was not necessarily on the front page as it would have been in Putnam County. The court also found that Stevens failed to demonstrate prejudice as the

---

**6.** Although Tippecanoe and Putnam County residents may receive some overlapping Indianapolis media, the court found that Tippecanoe County has its own daily newspaper and television station.

trial record showed that every panel of the venire was carefully questioned about pre-trial publicity by the court, State, and defense counsel. The evidence does not compel a decision opposite that reached by the post-conviction court.

### (3) Jury Questionnaire and Selection

The defendant challenges his trial counsel's performance in jury selection and particularly as to the jury questionnaires submitted to prospective jurors.

 He argues that his trial counsel used questionnaires that failed to address mitigation issues or to explain the meaning of "life without parole," and thus failed to ensure "that prospective jurors understood they could address future dangerousness with this sentencing option." Br. of Petitioner–Appellant at 34. We first note that the questionnaire form was not generated by counsel but prepared by the trial court and submitted to counsel for review. Trial Record at 343. Jury questionnaires are a useful tool employed by courts to facilitate and expedite sound jury selection. Their proper purpose is not to condition or indoctrinate prospective jurors with the parties' contentions, notwithstanding attempts of some counsel to the contrary. Ineffective assistance of counsel may not be based upon an alleged failure of counsel to thus misuse jury questionnaires.

 The defendant further alleges that his counsel were deficient in jury selection by failing to "integrate their mitigation theory into the voir dire process," Br. of Petitioner–Appellant at 34, and to exhaust peremptory challenges. We have held that it is permissible to use voir dire to inquire into jurors' biases or tendencies to believe or disbelieve certain things about the particular line of defense. Wisehart v. State, 693 N.E.2d 23, 45–46 (Ind.1998). The record reveals that defense counsel's voir dire questions extensively inquired regarding the jurors' openness to considering mitigating factors to prevent the imposition of the death penalty. We decline, however, to find a criminal defense attorney's performance to be deficient for failing to condition jurors as to the particular mitigation evidence anticipated in an individual case.

 The post-conviction court found that trial counsel were not ineffective for failing to exhaust their peremptory challenges. The court noted that, between the two of them, the defendant's trial counsel had spent over fifty hours reviewing the completed jury questionnaires. They challenged nineteen jurors for cause, seventeen of which were granted. The court noted that they used seventeen of their twenty peremptory challenges, but for strategic reasons did not exhaust them because "what was coming up was worse." Record at 726. The court also observed that counsel successfully rehabilitated several jurors that the State challenged for cause, forcing the State to exercise peremptory challenges. The evidence does not compel a decision opposite that reached by the post-conviction court.

### (4) Victim Impact Evidence

The defendant argues that counsel were deficient in not objecting to victim impact evidence in the State's opening statement and during its case in chief. He first urges that his counsel should have objected to the following remarks during the State's opening statement: "Zachary Snider was a typical ten-year-old. He loved to fish, play ball, ride his bicycle, and he couldn't sit still for long ... His parents, Todd and Sandi Snider, both worked to make ends meet." Trial Record at 3648. The defendant also challenges his trial counsel's failure to object to the State's

use of a picture of Zachary Snider holding a fish. This picture was passed to the jury and was allegedly displayed by the prosecution on four other occasions during the guilt phase of the trial. Defense counsel never objected to the photograph and the defendant claims they were deficient for not objecting to this "prejudicial drumbeat of victim impact evidence." Br. of Petitioner–Appellant at 38.

The post-conviction court found that defense counsel was not ineffective for failing to object to the introduction and use of the photograph. One of the defendant's defense attorneys testified during the post-conviction proceedings that, while he believed the use of the photograph was repetitive, he observed that it was sometimes prudent to not object so as to not draw the jury's attention to the evidence. A decision to not object to evidence when the objection may be more damaging than the evidence is within the wide range of professionally competent assistance. The trial court concluded, "Defense counsel's decision not to object to the admission of the [victim impact evidence] was a reasonable decision not to draw the jury's attention to this testimony." Record at 734. We agree. Because this represents reasonable trial strategy and because of the questionable merit of the allegedly omitted objections, the evidence does not compel a decision opposite that reached by the post-conviction court.

### (5) Loss of Right to testify

As one of his enumerated examples of alleged ineffective assistance of counsel, the defendant contends that his trial counsel gave him incorrect advice, upon which he based his decision not to testify at trial. He argues that counsel's advice was based upon the presumption that the defendant's testimony could add nothing supportive of the defense's strategy to seek a jury instruction on voluntary manslaughter. The post-conviction court, however, found:

> On the contrary, defense counsel were concerned about having Petitioner testify because he was an [sic] chronic liar who would have been a bad witness. Moreover, if Petitioner had testified during the guilt phase, there is a danger that he would open the door to otherwise inadmissible evidence. Defense counsel's advice that Petitioner not testify was a reasonable strategic decision based on sound professional judgment.

Record at 724. We are not persuaded that the evidence compels a decision opposite that reached by the post-conviction court.

### (6) Pursuing Voluntary Manslaughter as Defense Theory

The defendant claims that his trial counsel were ineffective for pursuing a "fundamentally flawed" approach to the case by proceeding on a theory of voluntary manslaughter. They tendered three proposed instructions that dealt with voluntary manslaughter, but these were rejected by the trial court. The defendant argues that there was no evidence in the record to support this theory, and that there was another viable defense available but not used.

The defendant urges that, if defense counsel had consulted other mental health experts, counsel "would have learned of [the defendant's] dissociative disorder, borderline personality disorder, chemical dependency, and LSD impairment at the time of the offense." Br. of Petitioner–Appellant at 42. In the post-conviction proceedings and in this appeal, the defendant's present counsel assert that the defendant was raped as a child; that at the time of the killing the defendant switched his identity with that of Zachary; that the defendant killed Zachary "because it's

what he would have wanted in that molestation at age 10, to have been killed by his abuser;" and that the defendant's ability to appreciate the wrongfulness of his conduct "was disengaged when he was dissociating." *Id.* The defendant argues further that, even if the voluntary manslaughter defense were regarded as legitimate strategy, this would not excuse the failure to present the mental illness defense.

The post-conviction court found that counsel's decision to pursue the voluntary manslaughter strategy, while ultimately unsuccessful, did not amount to deficient performance. The court pointed out that "[a]ny appreciable evidence of sudden heat justifies an instruction on voluntary manslaughter," *Roark v. State,* 573 N.E.2d 881, 882 (Ind.1991), and that sudden heat is defined as provocation arising from a variety of emotions. In the defendant's admissions of guilt to his brother, the defendant said that he "clicked" or "went off" when Zachary threatened to tell his parents about the defendant's sexual conduct. In the defendant's confession to police, he stated that he killed Zachary because he was afraid that Zachary would report him. Concluding that the defendant received effective assistance of counsel as to their strategy to pursue voluntary manslaughter instructions, the post-conviction court found that the defendant's trial attorneys "pursued the most viable defense available to them." Record at 664.

As to the failure to present a mental illness defense during the guilt phase, the post-conviction court noted that, had defense counsel done so, they would have opened the door to the admission of substantial incriminating evidence not otherwise presented during the guilt phase. *Cf. Miller v. Anderson,* 255 F.3d 455 (7th Cir. 2001). As we noted above, this included testimony that, upon the defendant's prior release from jail to probation for a previous conviction of child molesting, the defendant had declared his intent to kill his next child molesting victim to avoid returning to jail.

We conclude that the evidence as a whole does not lead unerringly and unmistakably to a decision opposite that reached by the post-conviction court, and we find that defense counsel's choice of defense theory did not constitute ineffective assistance of counsel.

*(7). Defense guilt phase closing argument*

■■■■■■. The defendant contends that defense counsel were deficient in failing to present argument or tender an instruction regarding the jury's authority under Art. 1, Sec. 19 of the Indiana Constitution to determine both the law and the facts. Stevens did not raise this issue in his petition for post-conviction relief. Issues not raised in the petition for post-conviction relief may not be raised for the first time on post-conviction appeal. *See* P–C.R. 1(8); *Allen,* 749 N.E.2d at 1171.

*(8) Mitigation Evidence*

■■■■ The defendant contends that his trial counsel were deficient during the penalty phase and sentencing hearing by failing to present sufficient evidence of mitigating circumstances. The defense presented various witnesses and evidence showing various mitigating circumstances including his parents' divorce and his living in the homes of different people while growing up, the defendant's troubled childhood including suffering childhood sexual abuse, his adolescent alcohol and drug use and diagnoses of passive personality, his depression and suicide attempts, and his poor academic performance. The defendant's post-conviction counsel, however, assembled several witnesses to testify regarding information and theories that

were not employed by defense trial counsel.

The defendant first argues that his trial lawyers unreasonably limited their penalty phase and sentencing presentations to events of his life that occurred before age 18 and that his counsel unreasonably relied upon Dr. Lennon, rather than presenting other psychological experts regarding the defendant's mental or emotional distress at the time of the killing. He argues that Dr. Lennon "was a fatal witness for the defense," noting that on cross-examination by the State, Dr. Lennon agreed with the State's theory that Zachary's murder appeared directly related to the defendant's fear of having to return to prison, and the defendant was not susceptible to traditional psychotherapy and was a serious danger to society. Br. of Petitioner–Appellant at 45. The defendant further urges that his trial counsel failed to present a reason for the defendant's crime. He argues that counsel should have presented expert evidence that, at the time of the killing, the defendant was under a mental disease or defect, with an impaired ability to appreciate the wrongfulness of his conduct and conform it to the law; that he was very likely influenced by the interactive use of drugs; that his disorders were treatable with medication and intensive, individual psychotherapy; and that he would not constitute a pedophilia threat in prison.

The post-conviction court rejected these claims. The court observed that expert witness opinions suggesting that the defendant had an impaired ability to appreciate the wrongfulness of his conduct would have been strongly contradicted by the extensive evidence of the defendant's multiple attempts to kill Zachary and then carefully to take steps to cover-up the crime. The court noted that even one of the defendant's own experts at post-conviction acknowledged that the defendant could appreciate the wrongfulness of his conduct when he took steps to hide Zachary's body. The post-conviction court later concluded:

> Defense counsel were not ineffective for failing to investigate and prepare evidence of organic and mental impairments, including dissociative disorders, borderline personality disorders, and the effects of long-term drug use. Defense counsel's investigation of Petitioner's mental health and prior use of drugs was reasonable, .... Both of [defendant's trial counsel] testified that they were aware of Petitioner's prior drug abuse. Dr. Lennon was also aware of Petitioner's prior drug abuse. However, Petitioner denied having recently used drugs: he "used to do drugs, used to drink," but that he stopped drinking when he got arrested for child molesting, and "had stopped smoking marijuana awhile before that, long before that, pretty much cause my sister got killed by a guy that was high and ever since that I had, I had gone from doing it heavy to real light and then stopped." Moreover addiction counselor Needham evaluated Petitioner in January 1993 and found that Petitioner did not have a drug or alcohol problem. Thus, defense counsel's investigation was reasonable.
>
> Moreover, had defense counsel adopted the strategy of emphasizing Petitioner's prior drug use, this would have been inconsistent with their mitigation strategy of portraying Petitioner as the passive victim of abuse. As Dr. Lennon testified, "so much of [Petitioner's] behavior could be explained by the abuse, the neglect that he's had on top of his genetic predisposition, and then you look at all the drugs that he's been surrounded with his birth mother, and then the fact that she probably—even though she denies it, the evidence will suggest that she probably did do drugs or alcohol

during pregnancy." Had defense counsel elicited evidence of Petitioner's prior use of illicit drugs, he would no longer appear to be a passive victim molded by outside forces, but would appear as someone who had actively decided to break the law. As the Seventh Circuit explained in *Stewart v. Gramley*, 74 F.3d 132, 136 (7th Cir.1996), "What is brought out [during the penalty phase] that will help [a defendant] is what goes to show that he is not as 'bad' a person as one might have thought from the evidence in the guilt phase of the proceeding. What is brought out that will hurt him is what goes to show that he is, indeed, as bad a person, or worse, than one might have thought from just the evidence concerning the crime." Defense counsel was not ineffective for failing to pursue a mitigation strategy that could have caused the jury to think that Petitioner had a more extensive history of lawbreaking than was otherwise apparent.

Record at 675–76 (included citations to record omitted).

The post-conviction court thus found that defense counsel were aware of petitioner's past drug abuse and investigated the mental health issues through the use of Dr. Lennon. Further, the court found that presenting the petitioner's chronic drug abuse would cut against the defense strategy of portraying the petitioner as a passive victim of abuse rather than someone with an extensive history of lawbreaking. The court determined that the strategic decision to pursue this mitigation strategy over another was not ineffective assistance of counsel. We are not persuaded that the evidence in the record unavoidably points towards an opposite result.

■ The defendant also contends that defense counsel was constitutionally inef-

fective because of a statement made by counsel during the penalty phase closing argument: "I am not going to tell you that anything that happened in Chris Stevens's life explains or excuses the events of July 15th, 1993. It doesn't, and he will have to suffer the punishment for that." Trial Record at 5440. The State responds that this statement was reasonable because it reminded the jury that "recommending a sentence other than death would not mean that they were excusing [the defendant] for his actions, and would not mean that [the defendant] would escape with no punishment." Br. of Appellee at 37.

The challenged statement was in the context of surrounding argument urging that the important part of the case before the jury was not whether the defendant committed the crime, but rather what penalty to recommend: a term of years, life imprisonment without parole, or death—any of which constitute severe punishment. Counsel's argument clearly emphasized the importance of mitigating circumstances. The challenged statement taken in context cannot reasonably be understood to have invited the jury to disregard mitigating circumstances. We decline to find deficient performance based on his claims of failure to present sufficient mitigating evidence during the penalty phase and sentencing.

*(9) Life without Parole Instruction*

■ The defendant contends that his trial counsel were deficient for failing to tender a penalty phase instruction that would have informed the jury of the "true effect" of life without parole. Br. of Petitioner–Appellant at 50. He argues that such an instruction was needed to offset the possibility that a juror might believe that if sentenced to life without parole, the defendant could be released early. The defendant argues that such an explanation should have been provided because there had been evidence on the issue of future

dangerousness and because his trial counsel allegedly provided misguided speculation during jury selection when responding to a potential juror's question concerning the meaning of life without parole.[7]

The post-conviction court's decision noted that it is unnecessary to instruct juries on words that are commonly understood. The court found that " 'life without the possibility of parole' consists of common words that may be easily understood by persons of average understanding." Record at 733. It also found that had any such instruction been tendered it would have been refused. The post-conviction court concluded that the defendant had received effective assistance of counsel as to this claim. We agree and decline to find ineffective assistance of trial counsel on this issue.

### (10) Conflict of Interest

■ The defendant contends that his two trial counsel disliked him and that their personal animosity toward him interfered with their duty of loyalty to their client, adversely affecting their representation of him, to his prejudice. This issue was not designated in the petition for post-conviction relief and thus may not be raised on appeal. See P–C.R. 1(8); Allen, 749 N.E.2d at 1171.

### (11) Use of Stun Belt

■ The defendant devotes a substantial section of his brief to his claim that the sheriff's decision to place a stun belt[8] on the defendant during trial is reversible error. This Court has recently declared that stun belts may not be used on defendants in Indiana courtrooms. Wrinkles v. State, 749 N.E.2d 1179, 1194 (Ind.2001). To the extent that the defendant asserts this issue as an independent claim, however, this issue is procedurally defaulted because it was not raised at trial, Williams v. State, 690 N.E.2d 162, 166 (Ind.1997), or

---

7. During voir dire, defense counsel asked, "Mr. [Juror], anything about life without parole that you either think is a good idea or a bad idea in general?" Juror: "As an alternative to the death sentence you mean?" Defense counsel: "Yes." Juror: "Well, I'd have to get an idea of what you meant by life without parole. Is that truly life without . . ." Defense counsel: "It means locked up. Yeah, that's what it means." Juror: "Even 20 years from now, the rules aren't going to change?" Defense counsel: "No. Well . . . [y]ou're the one that said you can't predict the future as to whether you change your views on the death penalty. I can't predict the future as to what the law is. Right now, the law is life without parole is life without parole. . . . It means if a person is sentenced to life without parole, they don't walk out ever again." Record at 1825–27. Two jurors were seated from the panel who witnessed this interchange, though the juror directly involved in the discussion was excused.

8. We recently described the nature and operation of the stun belt in Wrinkles v. State:

The stun belt . . . is an electronic shocking device that is secured around the wearer's waist. Two nine-volt batteries connected to prongs that are attached to the wearer over the left kidney region power the belt. The belt may be activated from as far away as 300 feet, and once activated it delivers an eight-second, 50,000–volt shock that cannot be stopped. This high-pulsed electrical current travels through the body along blood channels and nerve pathways. The belt's electrical emission knocks down most of its victims, causing them to shake uncontrollably and remain incapacitated for up to forty-five minutes. Activation may also cause immediate and uncontrolled defecation and urination, and the belt's metal prongs may leave welts on the wearer's skin requiring as long as six months to heal. Activation may cause some wearers to suffer heartbeat irregularities or seizures. Manufacturers of the stun belt emphasize that the belt relies on the continuous fear of what might happen if the belt is activated for its effectiveness.

749 N.E.2d 1179, 1193–94 (Ind.2001)(internal citations omitted).

on direct appeal, *Rouster v. State*, 705 N.E.2d 999, 1003 (Ind.1999). But because the defendant's argument also claims that his trial counsel's failure to object to the stun belt at trial constitutes prejudicial deficient performance, we will address the issue in the context of ineffective assistance of trial counsel.

■ The post-conviction court concluded that defense counsel were not ineffective for failing to raise this claim, noting that no evidence was presented that the defendant was impeded in his ability to assist his counsel, that no jurors were aware that Stevens was wearing a stun belt, and that the belt did not affect Stevens's appearance before the jury.

The defendant asserts that while none of the jurors were aware that he was wearing a stun belt, their perception of him was still affected by the fact that he was under restraint. The defendant argues that he was harmed because wearing the belt made him appear to the jurors as emotionally withdrawn, subdued, and unusually silent, which may have influenced them to recommend the death penalty. In the post-conviction proceedings, the defendant presented the testimony of Dr. Robert Kaplan who testified that the wearing of the stun belt at trial would have inhibited the defendant's expression of emotion.

The testimony of five of his capital trial jurors and the affidavit of a sixth juror were also presented. The jurors described the defendant as emotionally withdrawn, silent, and subdued. One juror stated that he did not appear remorseful. Three jurors stated that they observed the defendant interacting with his attorneys by passing notes and whispering. The defendant recognizes that his demeanor and affect as seen by the jurors during trial was essentially the same demeanor and affect they had seen during his videotaped confession. Br. of Petitioner–Appellant at 58.

We conclude that the evidence does not unmistakably lead to a result contrary to the post-conviction court's factual findings. From the circumstances presented in this case, we find no reasonable possibility that but for the failure of trial counsel to object to the stun belt, the results of the guilt phase, penalty phase, or sentencing would have been different.

## 2. Government Interference with Right to Counsel

The defendant contends that his trial counsel's preparation for and defense at trial was frustrated by various acts of governmental interference under circumstances that constructively denied him his right to counsel, to present a defense, and to a fair and reliable trial. His claim focuses upon trial counsel's difficulties in obtaining unquestioned attorney fee payments, the denial of *ex parte* access by defense counsel to the court regarding funds for investigative assistance, and counsel's inability to obtain further mental health evaluations. While these claims were known and not raised in direct appeal, to the extent that they are in the nature of claims of ineffective assistance of counsel under the Sixth Amendment and require consideration of evidence outside the trial record, we will address them. The gravamen of his claim is that the court prevented his attorneys from adequately preparing for trial and securing expert assistance. In *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), the Supreme Court recognized that when surrounding circumstances define a very small likelihood that any lawyer, even a fully competent one, could provide effective assistance, prejudice will be presumed without inquiry into the actual conduct of the trial. *Id.* at 659–60, 104 S.Ct. at 2047, 80 L.Ed.2d at 668. Only

where there has been an actual breakdown of the adversarial process will a Sixth Amendment violation be found without inquiry into counsel performance. *Id.* at 657–58, 104 S.Ct. at 2046, 80 L.Ed.2d at 667.

### (a) Fee Disputes

■ The defendant first alleges that Putnam County Circuit Judge LaViolette, who presided over the case until its venue was changed to Tippecanoe County, caused his attorneys "numerous difficulties in obtaining compensation" such that they "had to expend more time on collateral issues and attempting to have the assets or the resources to prepare for trial than [they had] in preparing for trial." Br. of Petitioner–Appellant at 61(citing Trial Record 733, 1413). The post-conviction court found that the billing procedures did not result in prejudice as neither counsel indicated at the post-conviction hearing that the disputes "prevent[ed] them from taking any particular step or cause[d] them to forgo any particular part of their defense." Record at 730.

The post-conviction court concluded that the fee disputes did not materially affect counsel's performance. At the post-conviction hearing one defense counsel stated that he believed that at the initial stages of the case the dispute "impaired our ability to research and investigate the case," but he could not recall any particular thing he did not do because of the disputes. Record at 2067, 2088. The other attorney stated that the disputes took up time, but he could not specify any particular step he did not take because of the disputes. Record at 2556. The evidence as a whole does not lead us unerringly to a decision opposite that of the post-conviction court.

### (b) *Ex Parte* Hearings for Funds

■ The defendant next alleges that judicial denial of his counsel's request for an *ex parte* hearing to determine funds for experts and investigation denied him a fundamental requirement to prepare and present a defense. He argues that the inability to obtain an *ex parte* hearing resulted in his attorneys (1) prematurely disclosing the identity of its consulting expert, (2) being unwilling to seek additional mental health experts or secure other evaluations, and (3) being hampered in their preparation for trial and choice of trial strategies.

The post-conviction court found that the "trial court did not deny defense counsel's requests for *ex parte* hearings, but merely informed counsel that they must show good cause before an *ex parte* hearing would be granted." Record at 745. The post-conviction court also determined that the order granting funds did not restrict counsel to any particular expert. *Id.* at 746. In addition, the court found that the defendant did not identify any part of the trial record where funds were denied after the case was venued nor where defense counsel's "thought process and strategies were required to be disclosed prior to the approval of funds for expert witnesses." Record at 746.

The defendant urges that appointed capital case counsel should be entitled to an *ex parte* determination of all motions for funds for assistance. We decline this broad request. Communication between one litigant and the court, in the absence of the other parties, is strongly discouraged. *See* Ind.Professional Conduct Rule 3.5; Ind.Judicial Conduct Canon 3(B)(8). In *Newhart v. State,* 669 N.E.2d 953 (Ind. 1996), the defendant claimed that the trial court erred when it refused to grant him an *ex parte* hearing on his request for funds. We stated that "[o]ur ethical rules counsel against such *ex parte* communications," and concluded that the defendant had not persuaded us that the trial court erred in this regard. *Id.* at 955.

Courts in sister states have reached varying decisions on the right to an *ex parte* hearing. The Arizona Supreme Court in *State v. Apelt*, 176 Ariz. 349, 861 P.2d 634, 649–50 (1993), determined that neither the Fourteenth Amendment's guarantee of due process nor that of equal protection entitles defendants to an *ex parte* hearing. Citing a similar judicial conduct canon as we did in *Newhart*, the Arizona court determined that *ex parte* communications are forbidden except where authorized by law, and as there were neither statutory nor organic law authorizing such a procedure the trial court did not err in refusing to conduct the hearing *ex parte*. *See also State v. Floody*, 481 N.W.2d 242, 256 (S.D.1992)(no constitutional grounds for *ex parte* hearing); *Ramdass v. Commonwealth*, 246 Va. 413, 437 S.E.2d 566, 570 (1993)(rejecting both federal and state constitutional arguments for an *ex parte* hearing), *rev'd on other grounds sub nom.*, 512 U.S. 1217, 114 S.Ct. 2701, 129 L.Ed.2d 830 (1994). In contrast, Louisiana has recognized a constitutional basis for allowing an *ex parte* proceeding, but requires a defendant to first demonstrate a particularized prejudice to the defendant from holding an adversarial hearing. *See State v. Touchet*, 642 So.2d 1213 (La.1994). In *State v. Phipps*, 331 N.C. 427, 418 S.E.2d 178, 191 (1992), North Carolina acknowledged that there are strong reasons to allow such proceedings to be held *ex parte*, but refused to find them to be constitutionally required and rather left the decision to trial court's discretion. Other states have decided that defendants are entitled to an unqualified *ex parte* hearing concluding that indigent defendants should not be required to reveal a defense theory or the identity of experts who are consulted but who may not testify at trial. *See Ex Parte Moody*, 684 So.2d 114, 120 (Ala.1996)(holding criminal defendant entitled to *ex parte* hearing on whether expert assistance is necessary based on Fifth, Sixth, Fourteenth Amendments to Constitution); *Brooks v. State*, 259 Ga. 562, 385 S.E.2d 81, 84 (1989) (deciding indigent defendant entitled to *ex parte* hearing to determine entitlement to public funds); *Arnold v. Higa*, 61 Haw. 203, 600 P.2d 1383, 1385 (1979)(determining indigent defendant entitled to *ex parte* hearing so that he can demonstrate indigency or particularize reasons for request for litigation expenses without disclosing defensive theories to State); *McGregor v. State*, 733 P.2d 416 (Okla.Crim.App.1987)(holding hearing to determine if defendant was entitled to court-appointed psychiatrist on motion must be *ex parte*); *State v. Barnett*, 909 S.W.2d 423, 429 (Tenn.1995)(holding that when indigent defendant seeks psychiatric assistance, the hearing should be *ex parte*); *Williams v. State*, 958 S.W.2d 186, 193–94 (Tex.Crim.App.1997)(deciding that an indigent defendant is allowed an *ex parte* proceeding because the defendant should not have to disclose defensive theories to prosecution in order to obtain "basic tools of an adequate defense").

█ While we recognize that strategic considerations will often lead defense counsel to prefer secrecy as to their funding requests, we find no automatic constitutional entitlement to such *ex parte* proceedings. A trial court may, however, upon a showing of good cause, permit an *ex parte* request for funds for assistance. The denial of such a request is reviewable for abuse of discretion.

In the present case the defendant has not demonstrated that the actions of the trial court in requiring good cause before permitting an *ex parte* request resulted in an actual breakdown of the adversarial process. There is no *Cronic* violation here.

### 3. Ineffective Assistance of Appellate Counsel

The defendant also contends that he did not receive effective assistance of his appellate counsel. His brief focuses upon the claim that his appellate counsel inadequately presented the issue that Zachary's age was "double counted" as an aggravating circumstance because age was a factor in more than one of the aggravators. The defendant also mentions in cursory fashion three additional allegations of deficient appellate representation: (a) failing to argue that his sentence was unreliable due to a reduction in the jury's sense of personal responsibility; (b) failing to adequately argue that the State improperly injected victim impact evidence through its use of a photograph of Zachary holding a fish; and (c) failing to raise the issue of governmental interference.

■■■ A defendant is entitled to the effective assistance of appellate counsel. *Evitts v. Lucey,* 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985); *Johnson v. State,* 693 N.E.2d 941, 950 (Ind.1998). Appellate ineffectiveness claims are evaluated under the *Strickland* standard of conduct falling below professional norms and resulting in prejudice such that our confidence in the outcome is undermined. *Bieghler v. State,* 690 N.E.2d 188, 192–93 (Ind.1997). As for challenges to an appellate counsel's strategic decision to include or exclude issues, courts should be particularly deferential "unless such a decision was unquestionably unreasonable." *Id.* at 194. To prevail on a claim of ineffective assistance of appellate counsel, a defendant must "show from the information available in the trial record or otherwise known to appellate counsel that appellate counsel failed to present a significant and obvious issue and that this failure cannot be explained by any reasonable strategy." *Ben–Yisrayl v. State,* 738 N.E.2d 253, 261

(Ind.2000). Deciding which issues to raise on appeal is one of the most important strategic decisions of appellate counsel. *Bieghler,* 690 N.E.2d at 193. Appellate counsel is not deficient if the decision to present "some issues over others was reasonable in light of the facts of the case and the precedent available to counsel when that choice was made." *Id.* at 194. Even if counsel's choice is not reasonable, to prevail, petitioner must demonstrate a reasonable probability that the outcome of the direct appeal would have been different. *Id.* An appellate ineffectiveness claim challenging the quality of counsel's actual presentation of a claim must "overcome the strongest presumption of adequate assistance." *Id.* at 196. If the claimed issues were presented by appellate counsel and analyzed by an appellate court, relief will only be afforded when the "appellate court is confident it would have ruled differently." *Id.*

■■■ The defendant contends that if his appellate counsel would have better presented the issue of overlapping aggravators, there is a reasonable probability that he would have prevailed on appeal. The issue was presented and extensively addressed on direct appeal. *Stevens,* 691 N.E.2d at 433–34. The defendant does not persuade us that this issue presented or argued differently would have produced a different result.

■■■ The defendant also claims ineffective assistance of appellate counsel alleging that his appellate counsel failed to argue that his sentence was unreliable due to a reduction in the jury's sense of personal responsibility because prospective jurors were "repeatedly reminded that they were only recommending a sentence [and two jurors] were exposed to a prospective juror's comments that she could rationalize rendering a verdict on the ground that the judge would be making the final decision."

Br. of Petitioner–Appellant at 66. The post-conviction court found that no evidence was produced at trial or on post-conviction that the jury's sense of personal responsibility was reduced, and that petitioner did not demonstrate that this issue was of greater merit than the issues actually raised on appeal. Record at 740.

The jury selection process lasted five days. The defendant does not cite the record or otherwise direct our attention to the instances in which he claims that prospective jurors were "repeatedly reminded that they were only recommending a sentence." As to his allegation that two jurors overheard another prospective juror's comment, there was no objection by trial counsel, nor did trial counsel challenge to remove the two jurors who overheard the comment.

As noted above, with respect to the defendant's challenge to his appellate counsel's strategic decision to include or exclude this issue, we should be particularly deferential "unless such a decision was unquestionably unreasonable." *Bieghler*, 690 N.E.2d at 193–94. The defendant has failed to demonstrate that his appellate counsel's decision to omit this issue was unreasonable. The defendant has likewise not shown a reasonable probability that the outcome of the direct appeal would have been different if the issue had been presented. We agree with the decision of the post-conviction court to deny relief as to the defendant's claim of ineffective assistance of appellate counsel.

 As to the defendant's assertion that his appellate counsel failed to adequately argue that the State improperly injected victim impact evidence by its use of a photograph of Zachary holding a fish, the designation of alleged ineffective ap-

pellate counsel in his petition for post-conviction relief does not identify any claim regarding victim impact evidence or mention the State's use of the photograph. The defendant's petition for post-conviction relief does claim that his appellate counsel was deficient in failing to adequately present a claim that the trial outcome "was unfair and unreliable due to the injection of irrelevant and prejudicial evidence proscribed by Ind. Evidence Rule 404(b)," [9] Record at 70, but the argument in his appellate brief does not refer to any claimed violation of Rule 404(b). We deem this claim to be procedurally defaulted. *See* P–C.R. 1(8); *Allen*, 749 N.E.2d at 1171. Similarly, the defendant's claim that his appellate counsel failed to raise issues of governmental interference was not designated in his petition for post-conviction relief and is thus likewise not available. Furthermore, we have already discussed both of these claims in the context of the defendant's allegations of ineffective assistance of counsel at trial.

### 4. Lethal Injection, Sentence Reliability

The defendant challenges the denial of his post-conviction claims that Indiana's lethal injection execution scheme violates international law, and that it contravenes evolving standards of decency, that it constitutes cruel and unusual punishment, and that his death sentence is unreliable.

 The first three of these claims were available but not presented on direct appeal and may not be asserted as post-conviction claims. *See Timberlake*, 753 N.E.2d at 597. As to the defendant's claim that his death sentence is unreliable, he asserts that the "jury and the judge were never provided information necessary

---

**9.** Ind.Evidence Rule 404(b) prevents the admission of evidence regarding "uncharged misconduct" or "prior bad acts" to prove a person's character.

to make an informed judgment as to the appropriate sentence." Br. of Petitioner–Appellant at 68. He argues that the jury was not informed about his mental disabilities and their interaction with his drug abuse and that the jury was not given a proper understanding of the sentence life without parole. We have considered these claims in the context of his assertions of ineffective assistance of counsel. We decline to consider sentence reliability as an independent freestanding post-conviction claim. *See Saylor v. State*, 765 N.E.2d 535, 544 n. 1 (Ind.2002); *Wrinkles*, 749 N.E.2d at 1187 n. 3; *Allen v. State*, 749 N.E.2d 1158, 1176 n. 28 (Ind.2001).

### 5. Incomplete, Unfair, and Biased Post–Conviction Relief Adjudication

#### (a) Use of State's Proposed Findings of Fact and Conclusions of Law

■ The defendant claims that he was denied a full, fair and unbiased adjudication of his post-conviction claims when the post-conviction court essentially adopted verbatim the proposed findings of fact and conclusions of law submitted by the State. In *Prowell v. State*, 741 N.E.2d 704 (Ind. 2001), we acknowledged that a trial court's verbatim adoption of a party's proposed findings may have important practical advantages and we expressly declined to prohibit the practice. *Id.* at 708–09. We noted, however, that the wholesale adoption of one party's findings results in an "inevitable erosion of the confidence of an appellate court that the findings reflect the considered judgment of the trial court."

*Id.* at 709; *see also Wrinkles*, 749 N.E.2d at 1188.

The sixty-five pages of findings and conclusions entered by the post-conviction court are for the most part identical to the proposed findings submitted by the State, but we note several differences. For example, the post-conviction court added two sentences to one issue, a couple of paragraphs to another, and corrected some of the misspellings. It is thus evident that the court carefully considered and purposefully used of the individual findings proposed by the State. The extensive findings of fact and conclusions of law addressed all the claims delineated in his petition. While near verbatim reproductions may appropriately justify cautious appellate scrutiny, we decline to hold that the post-conviction court's utilization of the State's proposed findings in the present case constituted a failure to provide the defendant with a full, fair and unbiased adjudication of his post-conviction claims.

#### (b) Failure to Recuse

■ Stevens claims his right to a full, fair and unbiased hearing was also violated by the post-conviction judge refusing to recuse himself. Judge Heid [10] presided over the post-conviction trial and also over the original trial. The defendant sought the judge's recusal on grounds that he intended to interview Judge Heid as a potential witness on the stun belt issue. *See* Ind.Judicial Conduct Canon 3(E)(1).[11] Judge Heid denied the motion, ruling that his testimony would be cumulative to the testimony of counsel.

10. Judge George Heid died during the pending of this appeal.

11. Indiana Judicial Conduct Canon 3(E)(1) provides:

(1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:

. . . .

(b) . . . the judge has been a material witness concerning [the matter in controversy].

The defendant does not challenge Judge Heid's impartiality, but rather he asserts that he was denied the opportunity to interview Judge Heid as a potential witness, which hobbled his case. In denying the motion to recuse, the trial court stated:

Well throughout the proceedings that were conducted here, the State was represented by three attorneys and the defense was represented by two attorneys and to the extent there were any conversations about procedural issues or housekeeping matters that for some reason may not have been recorded, I think all or almost all of those people were in attendance. I know if there were discussions about security issues the sheriff was in attendance with perhaps another deputy, and so I think there's ample witnesses who can testify about those conversations to the extent they took place without the requirement of calling the trial judge as a witness to add cumulative, perhaps cumulative testimony, and it seems however that the crux of this issue comes down to why was the decision made not to object and whether it was favorable or unfavorable to Mr. Stevens to have a stun belt rather than some other kind of restraint and the thought process, those decision making is—it's an internal process of the defense of which the court had no knowledge or certainty wasn't privy to the defense strategy in this matter and I would not be able to provide any helpful information about how that decision came about or whether it was favorable or unfavorable to the defendant. And also given the amount of work that's been done in this case in preparing it to this point, it's been pending since May of last year, and here we are ten days from a week long trial, it just seems to me

that this really isn't an appropriate situation for me to recuse myself and have you start all over with someone else in this case. So with due respect to your motion here, I think it should be and it is denied. We'll go ahead and I'll stay on the case.

Record at 952. We discern no error in the trial court's denial of the defendant's motion to recuse.

### Conclusion

We affirm the judgment denying the defendant's petition for post-conviction relief.

SHEPARD, C.J., and SULLIVAN, BOEHM and RUCKER, JJ., concur.