**Christopher PARISH Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 20A03–0502–PC–74.

Court of Appeals of Indiana.

Dec. 6, 2005.

Rehearing Denied Feb. 3, 2006.

Christopher Parish, Michigan City, pro se.

Steve Carter, Attorney General of Indiana, Matthew D. Fisher, Deputy Attorney General, Indianapolis, for Appellee.

## OPINION

VAIDIK, Judge.

### Case Summary

Christopher Parish, *pro se*, appeals the denial of his petition for post-conviction relief. His main arguments on appeal are that his trial and appellate counsel were ineffective and that he is entitled to a new trial on his charges of attempted murder and robbery resulting in serious bodily injury on grounds of newly discovered evidence. Concluding that Parish has established by a preponderance of the evidence that he received ineffective assistance of trial counsel, we reverse the post-convic-

tion court, vacate Parish's convictions, and remand for a new trial.[1]

### Facts and Procedural History

The underlying facts of this case, taken from this Court's opinion on direct appeal, are as follows:

The facts most favorable to the verdict establish that on the evening of October 29, 1996, Michael Kershner was in his apartment watching a movie with Eddie Love, Nona Canell, Jenny Dolph, Jason Actley, and Jermaine Bradley. When Kershner answered a knock at the front door, a tall man later identified as Keith Cooper, and a short man later identified as Parish, burst into the apartment. The intruders were armed and asked for drugs, money, and guns. After a brief struggle, Cooper shot Kershner in the stomach. Parish held a gun to Dolph and Bradley and said he would kill them if they moved. Before leaving the apartment, Cooper took an SKS rifle and Parish took a bag full of quarters. They also took a taser gun from the apartment.

During an investigation of the incident, Love informed Officer Steve Rezutko of the Elkhart Police Department that he knew Parish to be the non-shooter. As a result of that information, Officer Rezutko compiled an album containing sixty photographs, including Parish's. Both Canell and Dolph identified Parish as one of the intruders. Officer Rezutko subsequently showed a six-photo array to Kershner, who also identified Parish as one of the intruders.

On March 6, 1997, the State filed its amended information charging Parish with attempted murder and robbery resulting in serious bodily injury.

*Parish v. State*, 717 N.E.2d 997, No. 20A04-9810-CR-506 (Ind.Ct.App., Sept. 24,

---

1. We hereby deny Parish's motion for expedit- ed consideration of his appeal.

1999). The State charged Cooper with the same offenses and tried him first in 1997. Following a bench trial, Cooper was acquitted of attempted murder but convicted of robbery resulting in serious bodily injury.

Parish hired attorney Mark Doty to represent him at his 1998 jury trial. At trial, Parish presented an alibi defense. Seven witnesses, all of whom were family members, testified that Parish was in Chicago at the time of the shooting. The jury found Parish guilty as charged. At Parish's sentencing hearing, Doty stated:

> This is a situation where—as [the deputy prosecutor] had pointed [out] and we discussed before this trial ever occurred—this is going to be a matter of identification witnesses, versus the alibi witnesses.
>
> I feel that, perhaps due to some of my failing as an attorney, maybe I didn't do as good a job as I—as I could have. There were a number of alibi witnesses that we—a number of more witnesses that we could have called. There was much mentioned at the—at the trial, much cross-examination of the alibi witnesses; why didn't they go to the police right away? I didn't tell them to, and that's why they didn't.
>
> And perhaps that was a failing of mine, but I guess being jaded by the

system, I didn't see the value in that, given that - you know, it may have been a mistake that my client has to pay the price for.

Trial Tr. p. 760. The trial court sentenced Parish to thirty years on each conviction to run concurrently. Parish appealed to this Court, raising seven issues,[2] and we affirmed his convictions in 1999.

In 2000, Parish filed a petition for post-conviction relief, which was amended in 2004. At the hearing on his amended petition, Parish alleged, among other things, that Doty had failed to adequately investigate for trial. Specifically, Parish presented evidence, which the jury did not hear at his trial, suggesting that Michael Kershner was actually shot in the parking lot by the laundromat, not inside the apartment as the State's eyewitnesses testified at trial. Following the presentation of the evidence, the post-conviction court made several comments indicating that it was inclined to find that "*at least* [Parish is] entitled to a trial to determine ... whether or not this crime occurred in the apartment or outside in the parking lot." Appellant's App. p. 108 (emphasis added). Despite these comments, the post-conviction court ultimately denied Parish relief in an order making a wholesale adoption of the State's proposed Findings of Fact and Conclusions of Law.[3]

---

**2.** Parish's appellate counsel raised the following issues on direct appeal: (1) whether the trial court erred in admitting Love's out-of-court identification of Parish where Love did not testify at trial; (2) whether the trial court erred in denying Parish's motion for mistrial based on a police officer's testimony that several witnesses identified Parish out of a photographic array of "mug shots"; (3) whether the trial court failed to ascertain, following the removal of a juror, whether the remaining panel was contaminated; (4) whether the trial court erred in its handling of several questions submitted by the jury during deliberations; (5) whether the trial court properly instructed the jury on the issue of specific

intent; (6) whether the State's questioning of a witness regarding Parish's post-*Miranda* silence constituted reversible error; and (7) whether the evidence is sufficient to support Parish's convictions.

**3.** In *Prowell v. State*, 741 N.E.2d 704 (Ind. 2001), the Indiana Supreme Court made the following observations concerning the wholesale adoption of a party's findings:

> It is not uncommon for a trial court to enter findings that are verbatim reproductions of submissions by the prevailing party. The trial courts of this state are faced with an enormous volume of cases and few have

Thereafter, Parish filed a motion to correct error with the post-conviction court. At the hearing on this motion, Parish's post-conviction counsel identified several mistakes in the court's findings. For example, some of the findings provided that Parish was the shooter when in fact the record shows that Keith Cooper was the shooter. Following the hearing, the court issued the following order denying Parish's motion to correct error:

> This cause having been submitted to the Court on the Petitioner's Motion to Correct Errors and at the request of counsel for the Petitioner, the Court has re-read the entire transcript of the cause and while, as the Court previously indicated, the testimony of the witness Eddie Love, is at best described as suspect, the Jury had the opportunity to observe the witness and the entire proceedings in this cause and entered a judgment of conviction. The Court finds that the Petitioner has not carried his burden of proof to show that that judgment was inappropriate.

Appellant's App. p. 328. Contrary to the post-conviction court's order, Eddie Love did not testify at Parish's trial. As noted below, Love only testified at the post-conviction hearing. Therefore, the jury never had the opportunity to observe Love and evaluate his credibility. Parish, *pro se,* now appeals.

### Discussion and Decision

 Parish appeals the denial of his petition for post-conviction relief. A de-fendant who has exhausted the direct appeal process may challenge the correctness of his convictions and sentence by filing a post-conviction petition. *Stevens v. State,* 770 N.E.2d 739, 745 (Ind.2002), *reh'g denied.* Post-conviction procedures do not provide an opportunity for a super-appeal. *Id.* at 746. Rather, they create a narrow remedy for subsequent collateral challenges to convictions that must be based on grounds enumerated in the post-conviction rules. *Id.* Post-conviction proceedings are civil proceedings, and a defendant must establish his claims by a preponderance of the evidence. *Id.* at 745. Because the defendant is now appealing from a negative judgment, to the extent his appeal turns on factual issues, he must convince the appellate court that the evidence as a whole leads unerringly and unmistakably to a decision opposite that reached by the post-conviction court. *Id.* In other words, the defendant must convince us that there is no way within the law that the court below could have reached the decision it did. *Id.* at 745–46. We do not defer to the post-conviction court's legal conclusions, but we do accept its factual findings unless they are "clearly erroneous." *Id.* at 746.

 Although Parish raises numerous issues on appeal, we find one of them dispositive: whether his trial counsel was ineffective. To establish a post-conviction claim alleging a violation of the Sixth Amendment right to effective assistance of counsel, a defendant must establish before

---

the law clerks and other resources that would be available in a more perfect world to help craft more elegant trial court findings and legal reasoning. We recognize that the need to keep the docket moving is properly a high priority of our trial bench. For this reason, we do not prohibit the practice of adopting a party's proposed findings. But when this occurs, there is an inevitable erosion of the confidence of an appellate court that the findings reflect the considered judgment of the trial court. This is particularly true when the issues in the case turn less on the credibility of witnesses than on the inferences to be drawn from the facts and the legal effect of essentially unchallenged testimony. *Id.* at 708–09. The wholesale adoption of a party's findings is particularly troublesome where, as here, those findings contain errors.

the post-conviction court the two components set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Wesley v. State*, 788 N.E.2d 1247, 1252 (Ind.2003), *reh'g denied*. First, a defendant must show that defense counsel's performance was deficient. *Id.* This requires showing that counsel's representation fell below an objective standard of reasonableness and that counsel made errors so serious that counsel was not functioning as "counsel" guaranteed to the defendant by the Sixth Amendment. *Id.* Second, a defendant must show that the deficient performance prejudiced the defense. *Id.* To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would be different. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* Furthermore, there is a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Stevens*, 770 N.E.2d at 746. "Counsel is afforded considerable discretion in choosing strategy and tactics, and these decisions are entitled to deferential review." *Id.* at 746–47. "Isolated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render the representation ineffective." *Id.* at 747.

Although Parish alleges several grounds of trial counsel ineffectiveness on appeal, we find it necessary to address only two of them in order to reach the conclusion that trial counsel was ineffective.

■ Parish first argues that Doty failed to "conduct any meaningful pretrial investigation." Appellant's Br. p. 7. Specifically, Parish alleges that Michael Kershner was shot in the parking lot, not inside the apartment as the State alleged at trial, and that Doty should have independently investigated the shooting and then presented that evidence during his trial.[4] When deciding a claim of ineffective assistance of counsel for failure to investigate, we apply a great deal of deference to counsel's judgments. *Boesch v. State*, 778 N.E.2d 1276, 1283 (Ind.2002). In *Strickland*, the United States Supreme Court observed:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitation on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

*Strickland*, 466 U.S. at 690–91, 104 S.Ct. 2052.

At the post-conviction hearing, Parish presented substantial evidence to support his allegation that the shooting took place in the parking lot near the laundromat. Bryant Wheeler testified that he was in

---

4. Specifically, Parish's theory of the crime is that because Kershner was on home detention at the time of the shooting, he did not want the police to know that he was outside his apartment; therefore, Kershner and his friends fabricated the location of the shooting. In a police report, Kershner's sister, Chris Smallwood, stated that Kershner was currently on "night passes from Juvenile Detention and has to report there everyday and hourly when he is at home." Trial Tr. p. 174. She explained that Kershner was on detention for a "gun charge" and that he had previously violated his detention for "fail[ing] a drug screen." *Id.* Smallwood also told police that three months earlier, Kershner, who was a member of a gang, and two of his friends had been involved in a fight with several black males in the same parking lot.

the parking lot on the night of the shooting, that he saw Kershner and some other people leave the apartment building, and that approximately five minutes later he heard a gunshot come from the direction of the laundromat. Likewise, Stellena Neal testified that she was standing in the parking lot after purchasing marijuana from Kershner when Kershner and some other people left the apartment building. Shortly thereafter, she heard a gunshot. She then saw Kershner, who was bleeding, walk back to the apartment building from the direction of the laundromat.

Love, who did not testify at Parish's trial but whose out-of-court statement and identification of Parish were nonetheless admitted into evidence at trial,[5] testified that he and Kershner were walking around the apartment complex near the laundromat selling drugs when two unknown black men approached them and shot Kershner. Love said that Detective Rezutko, for whom he was allegedly selling drugs, coerced him into identifying Parish as the non-shooter and that he did so because he was afraid of the Elkhart police.

Crime technician Joel Bourdon testified that he found no blood "whatsoever" in the apartment despite an eyewitness' testimony that Parish was bleeding from his gunshot wound. P–C Tr. p. 53. However, blood was found in the car that was used to transport Kershner to a nearby fire station following the shooting. Bourdon also acknowledged that a police report indicated that a crime scene could not be located in the apartment. In addition, Lisa Black, a DNA expert with the Indiana State Police, testified that the DNA recovered from a hat found inside the apartment, which the State alleged at trial belonged to Cooper, did not match Cooper.[6]

Parish also presented evidence that there were twelve alibi witnesses who could account for his whereabouts on the night of the shooting but Doty called only seven of them at trial, all of whom were family members. In support, Parish introduced the affidavit of an alibi witness who was not a family member.

Doty testified at the post-conviction hearing that "the focus of [the] defense was on the alibi, namely saying that no matter what went on at the [crime] scene, that Mr. Parish wasn't there, he was some place else." P–C Tr. p. 23. In fact, Doty "assume[d]" that the crime occurred inside the apartment. *Id.* at 12. To that end, Doty did not conduct any independent investigation of the shooting. He did not try to locate other witnesses to the shooting, depose some of the State's key witnesses, or follow through on critical information contained in the police reports. Doty acknowledged that had he known about the evidence supporting Parish's theory, it would have been "important" for him to present it as an additional defense. *Id.* at 26. Additionally, although the DNA report regarding the hat was available at the time of Parish's trial, Doty claimed that he was not aware of it. Doty testified that had he been aware of that information, he would have used it at trial, and it would have tipped him off to conduct further investigation.

Based on the above evidence, we cannot conclude that Doty's decision not to investigate the shooting—and instead rely sole-

---

5. Specifically, Love said in his statement that the non-shooter looked like someone he knew, Chris Parish. The detective to whom Love gave his statement was not "real comfortable with that being a solid identification." Trial Tr. p. 444.

6. Testing conducted after Parish's trial revealed that the DNA found on the hat belonged to Johlanis Ervin from Michigan.

ly on the alibi defense—was reasonable. In other words, Doty did not make a reasonable decision not to investigate the shooting, which would have uncovered evidence that perhaps the crime did not occur as the State's eyewitnesses testified at trial. At the least, this information would have seriously undermined the eyewitnesses' testimony that the crime occurred inside the apartment. That is, if the eyewitnesses were not telling the truth about where the crime occurred, then that could cast doubt on their account of how the crime occurred and who was involved, thereby strengthening Parish's alibi defense. Doty's deficiency in this regard is further complicated by the fact that Doty failed to object to an *Allen* charge.

■ Specifically, Parish challenges an instruction that the trial court gave to the jury before it initially retired for deliberations, to which Doty did not object. The suspect portion of the jury instruction provides as follows:

> If you should fail to reach a decision, this case will be left open and undecided. Like all cases it must be disposed of at some time. Another trial would be a heavy burden on both sides.
>
> There is no reason to believe that the case can be tried again any better or more exhaustively than it has been. There is no reason to believe that more evidence or clearer evidence would be produced on behalf of either side.
>
> There is no reason to believe that the case would ever be submitted to twelve people more intelligent, more impartial or more reasonable than you. Any future jury must be selected in the same manner that you were.

Appellant's App. p. 155. During the course of the deliberations, the jury submitted several questions to the trial court. In responding to the jury's questions, the court did not give any additional instructions; rather, it responded by either not answering the questions, answering the questions, or rereading the disputed portions of the trial testimony. After approximately nine hours of deliberations, the jury returned its verdicts.[7]

An *Allen* charge is an instruction given to urge an apparently deadlocked jury to reach a verdict. *Hero v. State,* 765 N.E.2d 599, 604 (Ind.Ct.App.2002). "Such *additional* instructions are closely scrutinized to ensure that the court did not coerce the jury into reaching a verdict that is not truly unanimous." *Id.* (emphasis added). Here, the trial court did not give an additional instruction to an apparently deadlocked jury; it gave the challenged instruction before deliberations even began. In *Broadus v. State,* 487 N.E.2d 1298 (Ind. 1986), our Supreme Court addressed the situation where, as here, an *Allen* charge was given with the initial set of instructions. Our supreme court held that it "[did] not condone the use of paralleling language to the 'Allen charge,' ... where the modified 'Allen charge' was given with the initial set of instructions." However, the court concluded that to do so was "clearly harmless error." *Id.* at 1304.

Then, in *Bowen v. State,* 680 N.E.2d 536 (Ind.1997), which, like *Broadus,* was decided before Parish's trial, the Indiana Supreme Court held, "To the extent that trial courts address the possibility of juror disagreement in preliminary or final instructions, we find the general pattern instruction regarding jury deliberations[8] to be

---

7. On direct appeal, we found no error in the trial court's handling of the jury's questions. *See Parish,* 717 N.E.2d 997, No. 20A04-9810-CR-506, slip op. at 11.

8. At the time our Supreme Court decided *Bowen,* the pattern jury instruction regarding jury deliberations was somewhat different from the version that is in effect today. *See*

preferable and adequate, not warranting supplementation." *Id.* at 537 n. 2.

Here, the trial court gave the jury instruction the *Bowen* court recommended; however, the court wrongly supplemented it. As such, counsel should have objected to the offending portions of the instruction, and he was deficient for failing to do so. *See Lambert v. State,* 743 N.E.2d 719, 732 (Ind.2001) ("When an ineffective assistance of counsel claim is based on the trial counsel's failure to make an objection, the [petitioner] must show that a proper objection would have been sustained by the trial court."), *reh'g denied.* As opposed to *Broadus,* the error here is not clearly harmless. The jury deliberated for approximately nine hours and submitted several questions to the court during this time frame. The questions focused on two of the main eyewitnesses: Love and Nona Canell, Kershner's mother. Specifically, the jury wanted to review Love's statement to Detective Rezutko and wanted to know why he did not testify at trial. The jury also wanted to rehear a portion of Canell's testimony and had questions regarding her identification of Parish. Given that the only issue at trial was identification, the jury had several questions concerning two of the main eyewitnesses, and the jury did not hear testimony that the crime may not have occurred as the eyewitnesses testified, Doty's failure to object to the instruction was not clearly harmless.

 After analyzing these two instances of trial counsel deficiency, we conclude that Parish has shown a reasonable probability that had Doty independently investigated the shooting, presented that evidence, and then objected to the *Allen* charge, the result of the proceeding would be different. Parish has overcome the high burden of convincing us that the evidence as a whole leads unerringly and unmistakably to a decision opposite that reached by the post-conviction court. We therefore vacate Parish's convictions and remand for a new trial.

Reversed.

SULLIVAN, J., and FRIEDLANDER, J., concur.

*Bowen,* 680 N.E.2d at 537 n. 2. Indiana Pattern Jury Instruction (Criminal) No. 13.23 (3d ed.2004) currently provides in pertinent part:
 To return a verdict, each of you must agree to it.
 Each of you must decide the case for yourself, but only after considering the evidence with the other jurors. It is your duty to consult with each other. You should try to agree on a verdict, if you can do so without compromising your individual judgment. Do not hesitate to re-examine your own views and change your mind if you believe you are wrong. But do not give up your honest belief just because the other jurors may disagree, or just to end the deliberations. After the verdict is read in court, you may be asked individually whether you agree with it.