**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



APPELLANT PRO SE:

**JOHN HOLLINS**
Carlisle, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JUSTIN F. ROEBEL**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JOHN HOLLINS, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A02-1308-PC-719 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Marc T. Rothenberg, Judge
Cause No. 49G02-0509-PC-160480

**July 29, 2014**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BAKER, Judge**

Appellant-petitioner John Hollins appeals the denial of his petition for post-conviction relief following his convictions for three counts of rape, all class A felonies, one count of criminal deviate conduct as a class A felony, one count of criminal confinement as a class B felony, and his adjudication as an habitual offender. He argues that the post-conviction court erred in denying his petition because 1) the trial court erred in denying his motion to sever, 2) the trial court erred in ordering his sentence for criminal confinement to run consecutively to the sentence for one of the rape convictions, 3) his trial counsel was ineffective, and 4) his appellate counsel was ineffective. Concluding that the first issue is res judicata, the second issue is waived, and that neither counsel was ineffective, we affirm the judgment of the post-conviction court.

## FACTS

We summarized the facts as follows in Hollins's underlying appeal:

On August 28, 2002, B.F. worked at P.T.'s, a club near Pendleton Pike in Indianapolis. After finishing work late that evening, she started to walk home. Near the intersection of 10th and Gray Streets, a car driven by a man B.F. recognized as a patron of P.T.'s pulled over. The man offered her a ride, and she accepted. Although she was not far from her destination, the man drove a route that took her farther away. B.F. asked him to pull over and let her out, but he refused and continued to drive. The man pulled the car behind an old building located at 2440 Lafayette Road and parked.

B.F. testified that the man then moved her seat into the reclined position, held a box cutter to the side of her neck, "said if you cooperate, you'll live," and "made her take off" her pants, underwear, and shoes. (Tr. 59). B.F. testified that he "made [her] put her feet on the dashboard" and, while holding the box cutter against her neck, "raped [her]" by putting his penis in her vagina. (Tr. 60, 61). When he finished, he told her to get out of the car, then threw her clothes out, and backed the car around the building. B.F.

2

reported the incident to the police. She was taken to the hospital, where a sexual assault examination was conducted and evidence collected.

On the morning of April 8, 2003, J.R. was waiting at a bus stop across from the juvenile center located at 25th Street and Keystone Avenue. A car pulled up to the bus stop, and the driver asked her if she needed a ride. J.R. said no. The man pulled his car into the gas station near the bus stop and shouted something to her. J.R. walked to the car, and the man opened the passenger-side door. She saw him holding something with "a brown handle down by his leg" and "froze." (Tr. 112). The man "slid" over, grabbed her hand, and "told [her] don't scream, don't run, just get in." (Tr. 113). J.R. got in, and he drove the car a short distance and then pulled over. J.R. testified that he then "told [her] to close [her] eyes and he laid the seat back and he put [a] knife up to [her] throat." (Tr. 114). J.R. further testified that he "told [her] not to say anything or he would stab [her] and cut [her]." (Tr. 115). The man then resumed driving, continuing to hold the knife to J.R.'s throat. The man stopped the car behind the building located at 2440 Lafayette Road.

J.R. testified that the man then "told [her] . . . to take off [her] pants," moving the knife against her throat and threatening to "stab and cut" her if she did not comply. (Tr. 116). J.R. "started to take off" her pants, but then he "leaned over and pulled [her] shoes off and pulled [her] pants" and underwear off. (Tr. 117). J.R. testified that the man then unzipped his pants and ordered her to "give [him] oral," again threatening to "stab and cut [her]" before he "put his penis in [her] mouth." (Tr. 118). J.R. further testified that the man "then . . . moved down in between [her] legs and put [her] legs up" on the dashboard and "put his penis up inside [her] vagina." (Tr. 119). After finishing, the man threw her clothes out of the car, told her to get out and walk around to the front of the car, and backed the car around the building. J.R. reported the incident to the police, and she underwent a sexual assault examination and evidence was collected at the hospital.

On the morning of February 6, 2004, Rudolfo Prieto agreed to drive D.S. to a house near 16th and Concord Streets for her to make a drug purchase. On the way, D.S. and Prieto argued. After arriving at the house, D.S. went to the door and began knocking; Prieto drove away. When no one answered, D.S. started to walk home. Near the intersection of 10th and Concord Streets, a car pulled over to the side of the street and offered D.S. a ride; she accepted and got in the car. D.S. asked the man some questions and concluded that he was not a police officer; she then told him that she was

looking for some drugs and needed money. D.S. agreed to perform "some kind of sexual favor" for $20.00. (Tr. 260). He then drove to the back of the building located at 2440 Lafayette Road.

D.S. testified that he then "pulled out [a] box cutter" and held it to the side of her throat. (Tr. 245). D.S. further testified that the man told her to take off her pants, underwear, and shoes, while pressing "the knife a little deeper." (Tr. 246). D.S. complied; and he "reached over" and "pulled the lever" to recline the passenger seat, and then "crawled on top of [her]." (Tr. 247, 246). D.S. testified that he put his penis in her vagina, while continuing to hold the box cutter to her throat "the whole time." (Tr. 249). D.S. further testified that during the rape, the man accidentally hit a switch that lowered the rear passenger-side window. When he had finished raping her, he told her to get out and walk around to the front of the car; he then threw her clothes out and backed the car around the building.

D.S. put her clothes on and ran to a nearby business to call the police. Detective Hewitt, a sex crimes investigator with the Indianapolis Metropolitan Police Department, was dispatched and interviewed D.S. D.S. provided a good description of the rapist's car, and Hewitt drove her through the neighborhood near 2440 Lafayette Road. In the driveway of a home several blocks from the crime scene, they saw a car matching the description – with its passenger seat in the reclined position and its rear passenger-side window lowered. D.S. advised Hewitt that she was positive this was the car in which she had been raped. Hewitt then took D.S. to the hospital, where she underwent a sexual assault examination and evidence was collected.

Hollins v. State, No. 49A04-0704-CR-237 (Ind. Ct. App. May 29, 2008), slip op at 2-5.

In September 2005, the State charged Hollins with rape as a class A felony as to B.F.; rape as a class A felony, criminal deviate conduct as a class A felony, and criminal confinement as a class B felony as to J.R.; and rape as a class A felony as to D.S. A sixth charge alleged the rape of a fourth woman, L.B. The State also filed an information alleging that Hollins was an habitual offender.

4

In October 2006, Hollins filed a motion to sever the offenses and set a separate trial for each victim. The State responded that the facts established "signature crimes." Trial Tr. p. 531. The trial court granted the motion to sever the charge alleging the rape of L.B. because she delayed reporting the crime, and there was apparently a lack of DNA. However, the trial court denied severance of the other charges, agreeing with the State that the alleged offenses were "signature crimes." Trial Tr. p. 34.

A jury trial was held on March 12 and 13, 2007. B.F., J.R., and D.S. each testified that Hollins raped her while holding a blade to her neck. Forensic analysis reports established that evidence collected from B.F., J.R., and D.S. after the sexual examinations contained DNA matching Hollins's DNA profile. Hollins testified that he had consensual sex with each of the women and did not hold a box cutter or knife to the woman's neck. The jury convicted Hollins as charged, and he admitted he was an habitual offender. The trial court imposed a 110-year aggregate sentence.

On direct appeal, Hollins argued that the trial court erred in denying his motion to sever and that his sentence was inappropriate. This Court explained that Hollins did not have a right to severance of the offenses because a common modus operandi linked the offenses and the same motive induced the criminal behavior. Id. at 9. Specifically, we stated as follows:

> We have defined modus operandi as "a pattern of criminal behavior so distinctive that separate crimes may be recognized as the work of the same wrongdoer." Harvey v. State, 719 N.E.2d 406, 409 (Ind. 1999) (quoting Goodman v. State, 708 N.E.2d 901, 902 (Ind. Ct. App. 1999)). Here, the assaults on B.F., J.R., and D.S. had the same modus operandi.

5

Each woman was on foot and alone when approached by Hollins in his car. Each was offered a ride and once inside his car, taken to the same location. Once there, in each instance Hollins reclined the passenger side seat, placed a bladed weapon against the throat of each woman, ordered each woman to remove her clothing below waist-level, and proceeded (without the use of a condom) to insert his penis in her vagina. After completing each act of rape, Hollins would order the woman out of the car and then proceeded to throw her clothes out and back his car away. We find that this pattern of conduct is "sufficient to establish that the molestation of each victim was the handiwork of the same person." Craig, 730 N.E.2d at 1265. Further, the motive of the sexual offenses was the same – to satisfy Hollins's sexual desires. Id. Therefore, Hollins did not have a right as a matter of law "to a severance of the offenses." I.C. § 35-34-1-11(a).

Id. at 9-10.

We concluded Hollins made no showing that, in light of what actually occurred at trial, the denial of separate trials subjected him to prejudice. Id. at 10. Rather, we pointed out that had he been tried separately for each victim, the same DNA evidence would have linked Hollins to each woman, and each woman would have testified to the same facts. Id. We further found in light of the nature of the offenses and character of the offender, Hollins had failed to show that his sentence was inappropriate. Id. at 12.

In April 2013, Hollins filed a petition for post-conviction relief, which the post-conviction court denied. Hollins appeals the denial.

DISCUSSION AND DECISION

At the outset we note that pro se appellants, such as Hollins, are held to the same standard as trained counsel and are required to follow procedural rules. See Evans v. State, 809 N.E.2d 338, 344 (Ind. Ct. App. 2004), trans. denied. This has consistently been the standard applied to pro se litigants, and the courts of this State have never held

6

that a trial court is required to guide pro se litigants through the judicial system. Id. One of the risks that a defendant takes when he decides to proceed pro se is that he will not know how to accomplish all of the things that an attorney would know how to accomplish. Hill v. State, 773 N.E.2d 336, 346 (Ind. Ct. App. 2002).

We now turn to the merits of this appeal. Defendants who have exhausted the direct appeal process may challenge the correctness of their convictions and sentences by filing a post-conviction petition. Stevens v. State, 770 N.E.2d 739, 746 (Ind. 2002). A petitioner who has been denied post-conviction relief faces a rigorous standard of review on appeal. Dewitt v. State, 755 N.E.2d 167, 170 (Ind. 2001). The post-conviction court's denial of relief will be affirmed unless the petitioner shows that the evidence leads unerringly and unmistakably to a decision opposite that reached by the post-conviction court. Id. We consider only the probative evidence and reasonable inferences therefrom that support the post-conviction court's determination and we will not reweigh the evidence or judge the credibility of witnesses. Bigler v. State, 732 N.E.2d 191, 194 (Ind. Ct. App. 2000), trans. denied.

Here, Hollins argues that the post-conviction court erred in denying his post-conviction petition because 1) the trial court erred in denying his motion to sever, 2) the trial court erred in ordering his sentence for criminal confinement to run consecutively to the sentence for one of the rape convictions, 3) his trial counsel was ineffective, and 4) his appellate counsel was ineffective. We address each of his contentions in turn.

7

Because this Court concluded in Hollins's direct appeal that the trial court did not err in denying his motion to sever, the issue is res judicata and not subject to further examination. See Maxey v. State, 596 N.E.2d 908, 911 (Ind. Ct. App. 1992). In addition, because the consecutive sentencing argument was known and available but not raised on direct appeal, this issue is procedurally foreclosed. See Timberlake v. State, 753 N.E.2d 591, 597 (Ind. 2001). Accordingly, the only issues available for our review are whether Hollins's trial and appellate counsels were ineffective.

The standard of review for a claim of ineffective assistance of trial counsel is the same as for appellate counsel. Reed v. State, 856 N.E.2d 1189, 1195 (Ind. 2006). To prevail on a claim of ineffective assistance of counsel, the petitioner must establish the two components first set out in Strickland v. Washington, 466 U.S. 668 (1984). Specifically, the petitioner must demonstrate that counsel's performance was deficient. Smith v. State, 765 N.E.2d 578, 585 (Ind. 2002). This part of the test requires the petitioner to demonstrate that counsel's representation fell below an objective standard of reasonableness and that counsel's errors were so serious that they resulted in a denial of the right to counsel guaranteed under the Sixth Amendment of the United States Constitution. McCorker v. State, 797 N.E.2d 257, 267 (Ind. 2003). There is a strong presumption that counsel's representation was adequate. Stevens, 770 N.E.2d at 746. This presumption can be rebutted only with strong and convincing evidence. Elisea v. State, 777 N.E.2d 46, 50 (Ind. Ct. App. 2002).

8

To establish the second part of the test, the petitioner must demonstrate that counsel's deficient performance resulted in prejudice to the defendant. Smith, 765 N.E.2d at 585. The petitioner must show that but for counsel's unprofessional errors, there is a reasonable probability that the results of the proceeding would have been different. McCorker, 797 N.E.2d at 267. A reasonable probability for the prejudice requirement is a probability sufficient to undermine confidence in the outcome. Wesley v. State, 788 N.E.2d 1247, 1252 (Ind. 2003). If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed. Grinstead v. State, 845 N.E.2d 1027, 1031 (Ind. 2006).

Counsel is afforded considerable discretion in choosing strategy and tactics, and we will accord those decisions deference. Harris v. State, 861 N.E.2d 1182, 1127 (Ind. 2007). There is therefore a strong presumption that counsel rendered adequate assistance and used professional judgment. Id. Because all criminal defense attorneys will not agree on the most effective way to represent a client, isolated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render representation ineffective. Id. We now turn to Hollins's specific ineffective assistance claims.

Hollins first contends that trial counsel was ineffective because he failed to "insure [at the severance hearing] that the trial court based its decision on all relevant and available information." Appellant's Br. p. 4. Hollins appears to argue that trial counsel should have informed the trial court that the victims were prostitutes. He appears to believe that the trial court would have granted his motion to sever had the court known

9

the victims shared this similar background. According to Hollins, he "had the right to severance if the offenses [were] joined for trial . . . solely on the ground that they [were] of a same or similar character." Appellant's Br. p. 6.

However, the State correctly points out that Hollins's argument "ignores that the State may overcome a defendant's entitlement to severance by showing that the charges contain a common modus operandi indicating that the charges were the work of the same person." Appellee's Br. p. 13. On direct appeal, this Court concluded that Hollins did not have the right to severance of the offenses because a common modus operandi linked the offenses, and the same motive induced the criminal behavior. Hollins does not challenge this conclusion or argue that he was prejudiced by it. We find no ineffective assistance of trial counsel.

Hollins further argues that appellate counsel was ineffective. Specifically, he contends that appellate counsel "failed to raise the fact that the denial of the severance was an Abuse of Judicial Discretion and that Hollins's trial court was [ineffective] for his failing to ensure that the trial court had all of the relevant evidence necessary to SEVER Hollins's charges." Appellant's Br. p. 9. First, Hollins's appellate counsel did argue that the trial court abused its discretion when it denied his motion to sever, and this Court affirmed the denial. Hollins, slip op at 10. Further, having already determined that Hollins did not receive ineffective assistance of trial counsel, we conclude that appellate counsel's performance was not deficient for failing to argue the ineffectiveness of trial counsel. See Emerson v. State, 695 N.E.2d 912, 920 (Ind. 1998).

The judgment of the post-conviction court is affirmed.

BARNES, J., and CRONE, J., concur.