


FILED

Jan 21 2020, 9:56 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Indiana Supreme Court

Supreme Court Case No. 18S-DI-304

## In the Matter of
## Nicole D. Fraley,
*Respondent.*

---

Decided: January 21, 2020

Attorney Discipline Action

Hearing Officer Matthew R. Cox

---

**Per Curiam Opinion**

All Justices concur.

**Per curiam.**

We find that Respondent, Nicole Fraley, committed attorney misconduct by severely mismanaging her trust account and by engaging in a pattern of dishonest and fraudulent behavior. For this misconduct, we conclude that Respondent should be disbarred.

The matter is before the Court on the report of the hearing officer appointed by this Court to hear evidence on the Indiana Supreme Court Disciplinary Commission's verified disciplinary complaint. Respondent's 2005 admission to this state's bar subjects her to this Court's disciplinary jurisdiction. *See* IND. CONST. art. 7, § 4.

## Procedural Background and Facts

The Commission filed a three-count "Verified Complaint for Disciplinary Action" against Respondent on June 6, 2018, and we appointed a hearing officer. Following an evidentiary hearing, the hearing officer issued his report on September 13, 2019, finding Respondent committed violations as set forth below.

**Count 1**. From 2014 through 2018, Respondent engaged in pervasive financial misconduct, including multiple overdrafts of her trust account, commingling of personal and client funds, use of trust account funds to pay personal or business expenses, failing to deposit client funds into a trust account, and conversion of client funds.

**Count 2**. During the Commission's investigation into Respondent's trust account mismanagement, Respondent knowingly made false statements of material fact to the Commission and submitted to the Commission a false and forged affidavit purportedly executed by Respondent's former paralegal.

**Count 3**. The Commission initiated a noncooperation case against Respondent due to her failure to respond to requests for information, which was dismissed with costs after Respondent belatedly complied. Respondent did not timely pay those costs, prompting the Commission to send Respondent a notice letter in advance of petitioning for a costs

nonpayment suspension. Respondent replied with a letter to the Commission falsely stating that she had paid her costs. Respondent attached to that letter a copy of a check purportedly drawn on Respondent's personal checking account, which Respondent falsely represented she had previously mailed to the Commission. The Commission then requested from Respondent a copy of the cancelled check and bank records showing that the check was presented for payment. Respondent did not provide those items, but rather provided a money order to "serve[ ] as a replacement for the original check," which Respondent claimed had not been returned to her office or cashed.

## Discussion

The Commission alleged, and the hearing officer concluded, that Respondent violated these Indiana Professional Conduct Rules prohibiting the following misconduct:

> 1.15(a): Failing to hold property of a client separate from the lawyer's own property, and failure to maintain complete records of client trust account funds and keep them for a period of five years after termination of the representation.

> 1.15(c): Withdrawing funds from a client trust account without earning fees or incurring expenses.

> 8.1(a): Knowingly making false statements of material fact to the Disciplinary Commission in connection with a disciplinary matter.

> 8.4(b): Committing criminal acts that reflect adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer.

> 8.4(c): Engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation.

> 8.4(d): Engaging in conduct prejudicial to the administration of justice.

The Commission also alleged, and the hearing officer also concluded, that Respondent violated the following Indiana Admission and Discipline Rules:[1]

> 23(29)(a)(4) (2016): Commingling client funds with other funds of the attorney or firm, and failing to create or retain sufficiently detailed records of the attorney's trust account.
>
> 23(29)(a)(5) (2016): Making withdrawals from a trust account, including cash and electronic withdrawals, without written withdrawal authorization stating the amount and purpose of the withdrawal and the payee.
>
> 23(29)(a)(4) (2017): Failing to retain complete records, including copies of fee agreements, and to keep such records for a period of five years after termination of the representation.
>
> 23(29)(c)(2) (2017): Paying personal or business expenses directly from the attorney's trust account.
>
> 23(29)(c)(4) (2017): Failing to deposit client funds intact into the attorney's trust account.
>
> 23(29)(c)(5) (2017): Making disbursements from a trust account in the form of cash or counter withdrawals.

In her petition for review, Respondent largely does not contest the accounting violations underlying Count 1, although she contends those violations did not result in conversion of client funds. Regarding Counts 2 and 3, Respondent essentially invites us to reweigh what she claims is conflicting evidence presented to the hearing officer. Having conducted

---

[1] The time period at issue in this case spans several amendments to Rule 23 that became effective on January 1, 2017, including a substantial revision and reorganization of section 29.

our own *de novo* examination of the materials before us,[2] we find Respondent's arguments wholly unavailing.

Respondent's contention that she did not convert client funds rests on her untenable claim that all client payments deposited into her trust account were flat fees that had been fully earned by Respondent at the time of deposit. (*See* Pet. for Rev. at 2 (citing Tr. Vol. 2 at 101)). We initially note the written fee agreements and appropriate accounting records that ordinarily would be available to help test such a claim are not available here, because Respondent intentionally destroyed the former and failed to maintain the latter. Further, Respondent's testimony at the final hearing that she believed these to have been fully-earned fees at the time of deposit is flatly contradicted by Respondent's statement to the Commission during its investigation that "I have never knowingly deposited personal funds into any of the firm's trust accounts." (Comm'n Ex. 52, Ex. Vol. 3 at 64). In any event, Respondent's admission to having improperly commingled client and personal funds in her trust account necessarily acknowledges the existence of client funds in that account, and the record provides ample direct and circumstantial evidence that Respondent converted client funds for her own personal use. To cite just two of the more blatant examples, Respondent deposited a $300 retainer

---

[2] Respondent faults the hearing officer for having adopted a substantial portion of the Commission's proposed findings verbatim. In the context of appellate review, we have explained that "wholesale adoption of one party's findings results in an inevitable erosion of the confidence of an appellate court that the findings reflect the considered judgment of the trial court" and that "near verbatim reproductions may appropriately justify cautious appellate scrutiny." *Stevens v. State*, 770 N.E.2d 739, 762 (Ind. 2002) (cleaned up). However, our process of review in disciplinary cases differs somewhat from the appellate review process. *See, e.g.*, *Matter of Coleman*, 67 N.E.3d 629, 630 n.1 (Ind. 2017) ("Where review is timely sought, we review *de novo* all matters presented to the Court, with the hearing officer's findings receiving emphasis due to the unique opportunity for direct observation of witnesses"). Moreover, the hearing officer did not adopt any substantive portion of the Commission's six-page proposed sanction analysis, nor did the hearing officer adopt the Commission's ultimate sanction recommendation, both of which demonstrate that the hearing officer "carefully considered and purposefully used [ ] the individual findings proposed by" the Commission. *See Stevens*, 770 N.E.2d at 762. In any event, our *de novo* review of the record has revealed ample, and indeed overwhelming, support for the findings in the hearing officer's report.

for one client and then promptly withdrew $323.89 as her "flat fee" in that case, which Respondent acknowledged "doesn't make any sense" and left her in the negative with that client. (Comm'n Ex. 60, Ex. Vol. 6 at 34-35). In a second client's case, involving the handling of settlement proceeds that indisputably included client funds being processed through the trust account, Respondent claimed to have paid $1,112 to that client's insurer when in fact Respondent had paid this amount to another client. Respondent also told the Commission that two checks totaling about $7,800 drawn from settlement proceeds in that case were written to a church's building and scholarship funds pursuant to the terms of settlement, when in fact those checks were payments for Respondent's children's private school tuition. (Comm'n Ex. 29, Ex. Vol. 2 at 46-48; Comm'n Ex. 55, Ex. Vol. 4 at 238; Comm'n Ex. 60, Ex. Vol. 6 at 56). Finally, Respondent's series of overdrafts (eight in all, including four totaling about $1,000 committed after Respondent had completed two remedial financial education courses) and her elaborate pattern of deception regarding those overdrafts provide substantial additional support for the hearing officer's finding of conversion.

Turning to that pattern of deception, the record likewise offers scant reason to second-guess the hearing officer's findings. Regarding Count 2, the evidence overwhelmingly supports the findings that Respondent, in an attempt to shift blame for one of the overdrafts onto a former paralegal, knowingly provided the Commission with a forged and false affidavit purportedly from her former paralegal. In the affidavit, the paralegal's name was misspelled, her address and telephone number were incorrect, and her signature differed from the paralegal's signature on other documents executed while in Respondent's employ. Similarly, the notary's signature on the affidavit differed from the signature the notary provided to the Commission, and the notary's commission expiration date on the affidavit was inaccurate. Both the paralegal and the notary testified they had never met one another and had never seen the affidavit before, and Respondent admitted a material factual assertion in the affidavit – that the paralegal was responsible for making daily deposits to the trust account – was false. (*See* Comm'n Ex. 60, Ex. Vol. 5 at 242; Tr. Vol. 2 at 43). Against this backdrop, Respondent would have us weigh more heavily

testimony from herself and her legal partner and mother, Carol Weber, that Weber found the affidavit dropped through the firm's front door mail slot. (Pet. for Rev. at 3). The hearing officer was not required to credit this testimony, though. Even if he had, this testimony does not preclude the possibility Respondent placed the affidavit in the mail slot herself, intending it to be found by Weber. More importantly, under the circumstances this testimony simply does not bear on the questions of whether the affidavit was forged or known to be false at the time Respondent provided it to the Commission.

The evidence also overwhelmingly supports the findings that Respondent made a series of false statements to the Commission regarding an "extensive accounting" of her trust account allegedly performed by a bank manager at Respondent's request. Respondent identified this manager as "Jessica Wells," a person with whom Respondent indicated she was personally acquainted through her daughter's soccer team. Respondent also provided the Commission with an address and phone number for "Jessica Wells" she indicated she had obtained through a soccer team list containing the names and contact information of the parents. However, the bank has never employed anyone by the name "Jessica Wells," the address provided by Respondent is a heavily-wooded and vacant lot, and the phone number provided by Respondent belonged to one of Respondent's clients, M.B., a fact Respondent attempted to conceal by omitting M.B. from the list of clients she provided to the Commission. Notwithstanding Respondent's reiteration of this "Jessica Wells" narrative during her final hearing testimony, Respondent's counsel expressly stipulated at the hearing that "we're in agreement there was no Jessica Wells" and that "this person doesn't exist." (Tr. Vol. 2 at 73).[3]

---

[3] Counsel attempted to qualify this stipulation by suggesting that Respondent simply might have been mistaken about this person's name (*id.* at 72), but such a position cannot be reconciled with Respondent's insistence that she was personally acquainted with this person and obtained the person's contact information from a list identifying parents by name.

Respondent also made numerous other false statements to the Commission regarding her accounting practices. For example, Respondent repeatedly denied being a signatory on her firm's business account. When ultimately confronted at a deposition with several checks drawn on the business account bearing her handwriting and signature, Respondent simply repeated the phrase "I shouldn't have signed the check." (Comm'n Ex. 60, Ex. Vol. 6 at 29). And Respondent similarly denied any knowledge of the existence of a personal checking account shared jointly with her husband, even after being confronted with several checks drawn on that account bearing her handwriting and signature. (*Id.* at 27, 29).

Regarding Count 3, Respondent argues "there was no evidence to support th[e] inference" that Respondent also lied about having mailed a check for payment of costs to the Commission (Pet. for Rev. at 3), but the evidence readily supports such an inference. Respondent told the Commission she had paid her costs via personal check, and she attached a copy of "Check No. 195" from her personal account bearing a date of August 8, 2017. Respondent did not respond to the Commission's request for copies of Respondent's bank records or a copy of the cancelled check. The Commission eventually subpoenaed Respondent's personal bank records, which revealed that Respondent had disbursed all of her personal checks substantially in numeric order, and that from June 2017 through November 2017 Respondent had been disbursing checks numbered in the 160s. (*See* Comm'n Ex. 53, Ex. Vol. 3 at 87-246 and Vol. 4 at 4-48).

In sum, we find sufficient support for the hearing officer's findings and conclusions with regard to all three counts against Respondent, and we likewise find Respondent violated each of the rules set forth above.

We address finally the question of appropriate sanction. Respondent has no prior formal discipline,[4] and if her misconduct had been limited to

---

[4] However, Respondent has been the subject of three separate show cause proceedings arising from her noncooperation with investigations by the Commission, and her first four overdrafts resulted in an informal disposition reached with the Commission. (*See* Comm'n Ex. 13, Ex. Vol. 1 at 52; Comm'n Ex. 73, Ex. Vol. 6 at 129).

negligent accounting practices we might have been inclined to agree with her proposal for a probationary model of discipline with trust account monitoring. *See, e.g., Matter of Mercho*, 78 N.E.3d 1101 (Ind. 2017) (imposing a 90-day active suspension followed by probation with trust account monitoring where the attorney's financial mismanagement was negligent but not criminal). However, Respondent's criminal conversion of client funds, and her elaborate pattern of fraudulent and dishonest behavior during the investigation and litigation of this matter, elevate this case into an entirely different realm. *Matter of Ellison*, 87 N.E.3d 460, 462 (Ind. 2017); *Matter of Pierce*, 80 N.E.3d 888, 890-91 (Ind. 2017). Respondent lied at innumerable junctures to the Commission and during sworn testimony, forged an affidavit containing false statements of material fact, falsified a personal check, and even invented a fictitious bank manager – all in an effort to extricate herself from various investigations and proceedings that began as simple overdraft inquiries. Put simply, the criminal and dishonest nature of Respondent's pattern of misconduct demonstrates that she cannot be safely recommended to the public as a person fit to practice law. Further, Respondent's total lack of insight during these proceedings into the wrongfulness of failing to account for client funds and using those funds to pay personal expenses, and her utterly inexplicable decisions during the progression of this case to double and even triple down on her demonstrably false statements, persuade us that her fitness to practice law is not capable of being restored.

## Conclusion

The Court concludes that Respondent violated Professional Conduct Rules 1.15(a), 1.15(c), 8.1(a), 8.4(b), 8.4(c), and 8.4(d), and Admission and Discipline Rules 23(29)(a)(4) (2016), 23(29)(a)(5) (2016), 23(29)(a)(4) (2017), 23(29)(c)(2) (2017), 23(29)(c)(4) (2017), and 23(29)(c)(5) (2017). For Respondent's professional misconduct, the Court disbars Respondent from the practice of law in this state effective immediately. Respondent shall fulfill all the duties of a disbarred attorney under Admission and Discipline Rule 23(26). The costs of the proceeding are assessed against Respondent, and the hearing officer appointed in this case is discharged.

All Justices concur.


ATTORNEYS FOR RESPONDENT

James R. Williams

Matthew L. Kelsey

Muncie, Indiana

ATTORNEY FOR INDIANA SUPREME COURT

DISCIPLINARY COMMISSION

G. Michael Witte, Executive Director

Indianapolis, Indiana