## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 18 2020, 9:44 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

APPELLANT *PRO SE*

Robert Petty
Pendleton, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Evan Matthew Comer
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Robert Petty,

*Appellant-Petitioner,*

v.

State of Indiana,

*Appellee-Respondent.*

August 18, 2020

Court of Appeals Case No.
20A-PC-587

Appeal from the Scott Circuit Court

The Honorable Maria D. Granger, Judge

Trial Court Cause No.
72C01-1902-PC-2

**Bradford, Chief Judge.**

# Case Summary

In 2013, Robert Petty was convicted of Class B felony voluntary manslaughter, Class D felony removal of a body from the scene, and Class D felony obstruction of justice, and he admitted to being a habitual offender, for which he was sentenced to an aggregate term of fifty-six years of incarceration. On direct appeal, we affirmed Petty's convictions and sentence, and the Indiana Supreme Court denied transfer.

In 2019, Petty petitioned for post-conviction relief ("PCR"), alleging ineffective assistance of trial and appellate counsel. The post-conviction court denied Petty's petition. Petty contends that the post-conviction court erred by denying him PCR. We affirm.

# Facts and Procedural History

The underlying facts leading to Petty's appeal of the denial of his PCR petition are as follows:

> On April 7, 2007, Petty married Nina Keown (Keown), and welcomed their daughter, B.P., a month later. On October 9, 2009, Petty and Keown divorced, but got back together in July 2010. Keown was also in the process of moving back into Petty's house located on 7168 East Plymouth Road, Lexington, Indiana.
>
> On August 7, 2010, Petty, Keown, and B.P. drove to Clarksville, Indiana for a day of shopping. Petty bought a video game at a game store, two pints of Jim Beam at a liquor store, and a ring for Keown at a pawn shop. They drove back to Lexington arriving around 4:30 p.m., dropped off B.P at Petty's fathers'

house, and drove to Scottsburg, Indiana to attend the HopStock Music Festival (concert). Petty and Keown were together at the beginning of the concert but later separated. At some point, Petty wanted to go home. He walked back to his Camo 4–Wheeler (4–Wheeler) only to find Keown standing next to it, talking to somebody on her cellphone. Keown quickly hung up, and when Petty asked who she was talking to, Keown replied, "none of your [f*****g] business." (Transcript p. 1488). This made Petty angry and they started to argue. They were both intoxicated from the alcohol they had consumed at the concert. The pair set off in the 4–Wheeler but stopped at the intersection of Plymouth Road and Highway 3, where they got out and continued arguing for about two to three minutes before climbing back into the 4–Wheeler and driving the rest of the way home.

Once they arrived at Petty's residence, Petty snatched Keown's cellphone. Using her call history, Petty called the last number Keown had dialed. It turned out that Keown had called a wrong number, and had spoken to a man by the name of Joe Barger (Barger). Barger told Petty that Keown had called him three times asking for "Mitch." (Tr. p. 1456). Petty called Barger approximately ten times but Barger refused to talk to him or disclose his identity. In one of these ten phone calls, Petty threatened Barger and told him that he would go over to his house to "whip" and "kill" him. (Tr. p. 1462).

In the meantime, Keown had gone to the master bedroom and had passed out on the bed, with her feet hanging over the foot of the bed. Since Petty did not get any information from Barger, he went into the master bedroom to ask Keown the same question. Keown was unconscious and could therefore not answer him back. At this point, Petty was "mad at her," he got on top of Keown, put his hands on her throat and choked her. (Tr. p. 1575).

When Petty saw that Keown was not responding, Petty left the house and drove back to Scottsburg, Indiana, stopping at Wal–Mart and Burger King. Approximately one hour

later, Petty drove back to his house and found Keown still unconscious and she had turned blue. Petty tried to resuscitate Keown but she did not wake up. According to Petty, he knew Keown had died because she had urinated on herself. Petty decided that he did not want to go to jail, so he tried "to [ ] make it all disappear." (Tr. p. 1527). Petty placed Keown's body and her boots into the back of his 4–Wheeler, and drove out into the countryside stopping near Saluda, Indiana. He then placed two phone calls from Keown's cellphone in an attempt to divert suspicion from himself. After that, Petty removed Keown's cellphone battery, and threw it into the field. Petty decided not to dump Keown's body there, so he drove further down, stopping at Bethlehem Road in New Washington, Indiana. The road was on hill and was overlooking a heavily wooded area. Petty picked up Keown's body, stepped over the guardrail, and began carrying her body down the hill and into the woods. The hill was quite steep and Petty quickly fell, dropping Keown's body. Petty left Keown's body where it came to rest. He then drove for a while only to realize that Keown's boots were still on the floorboard of his 4–Wheeler; he stopped and pitched the boots over the guardrail. At some point, he also realized that he still had Keown's ring in his pocket, so he also pitched it somewhere along that route.

The next morning, he returned to the site where he had dumped Keown's body to retrieve her clothes, because Petty feared, if found, it might assist the police in identifying him as Keown's killer. He then drove back home, and burned Keown's clothes alongside his bed clothes in his backyard. On the same day, Petty called Keown's mother and grandmother and asked whether they had seen or heard from Keown. Petty told them that he and Keown had argued at the concert the night before, and the last time he had seen her was when she walked away at the intersection of Plymouth Road and Highway 3. Petty would continue to tell the same story to the police for about three weeks.

On August 26, 2010, while Petty was in custody for an unrelated case in [the] Clark County Jail, Petty asked to speak to the sheriff but he was not available. Petty spoke to Deputy Sherriff, Racheal Lee (Deputy Lee), and he confessed to killing Keown and he offered to aid the officers in Scott County with Keown's investigation. Thereafter, Deputy Lee called Scott County Sherriff Department, and arranged to meet officers near the site where Petty had dumped Keown's body. Keown's skeletal body was found the next day.

On September 29, 2010, the State filed an Information charging Petty with Count I, murder, I.C. § 35-42-1-1; Count II, removal of body from scene, a Class D felony, I.C. § 36-2-14-17; and Count III, obstruction of justice, a Class D felony, I.C. § 35-44-3-4. That same day, the State amended the Information adding a fourth charge, Count IV, habitual offender, I.C. § 35-50-2-8.

Petty's jury trial was conducted on January 29, 2013 through February 13, 2013. Toward the end of the trial, Petty tendered jury instructions on involuntary manslaughter. The trial court denied his request and only instructed the jury on voluntary manslaughter as the lesser-included offense of murder. At the close of the hearing, the jury returned a guilty verdict of voluntary manslaughter, removal of body from scene, and obstruction of justice. Following the return of a guilty verdict on all Counts, Petty admitted to the habitual offender charge.

On April 17, 2013, the trial court held Petty's sentencing hearing. In the end, the trial court sentenced Petty to consecutive sentences of: twenty years on voluntary manslaughter, enhanced by thirty years due to his habitual offender status; three years for removal of body from scene; and three years for obstruction of justice. Thus, Petty's aggregate sentence was fifty-six years.

*Petty v. State*, No. 72A05-1305-CR-237, 2014 WL 1924253, at *1–3 (Ind. Ct. App. 2014), *trans. denied*. On appeal, Petty argued that (1) the trial court abused

its discretion in admitting several autopsy photographs, (2) the trial court failed to tender the proper jury instructions, (3) there was insufficient evidence to prove beyond a reasonable doubt his conviction of voluntary manslaughter, and (4) his sentence was inappropriate, with which we disagreed, affirming his convictions and sentence. *Id*. at *8. Petty sought transfer, which was denied by the Indiana Supreme Court. *Petty v. State*, 14 N.E.3d 44 (Ind. 2014).

[4] On February 22, 2019, Petty filed his PCR petition, alleging ineffective assistance of trial and appellate counsel. The post-conviction court held bifurcated evidentiary hearings regarding Petty's PCR petition on December 5 and 19, 2019. On February 6, 2020, the post-conviction court denied Petty's PCR petition.

# Discussion and Decision

[5] The standard of review for appeals from the denial of PCR is well-settled. Petitioners who have exhausted the direct-appeal process may challenge the correctness of their convictions and sentences by filing a post-conviction petition. *Stevens v. State*, 770 N.E.2d 739, 745 (Ind. 2002). Petitioner bears the burden of establishing grounds for PCR by a preponderance of the evidence. *Id*. By appealing from a negative judgment, a petitioner faces a rigorous standard of review. *Wesley v. State*, 788 N.E.2d 1247, 1250 (Ind. 2003). Denial of PCR will be affirmed unless, "the evidence as a whole leads unerringly and unmistakably to a decision opposite that reached by the post-conviction court." *Id*. We do not

defer to the post-conviction court's legal conclusion but do accept its factual findings unless they are clearly erroneous. *Stevens*, 770 N.E.2d at 746. The post-conviction process does not provide a petitioner with a "super-appeal" but, rather, a "narrow remedy for subsequent collateral challenges to convictions, challenges which must be based on grounds enumerated in the post-conviction rules." *Rouster v. State*, 705 N.E.2d 999, 1003 (Ind. 1999). Issues that were known and available but not raised on direct appeal are waived, and issues raised but decided adversely are *res judicata*. *Id.*

# I. Ineffective Assistance of Trial Counsel

[6] Petty contends that his trial counsel was ineffective for (1) stating in closing argument that Petty's intoxication was not a factor the jury could consider, (2) failing to object to Pamela Murray Campbell's testimony at the sentencing hearing, (3) failing to object to the trial court's use of the elements of his obstruction-of-justice conviction to enhance the sentence for his removal-of-a-body-from-the-scene conviction, and (4) failing to object to what he characterizes as the trial court's expressed displeasure with the jury's verdict for voluntary manslaughter.

> This Court reviews claims of ineffective assistance of counsel under the two components set forth in *Strickland v. Washington*, 466 U.S. 669, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, the defendant must show that counsel's performance was deficient. This requires a showing that counsel's representation fell below an objective standard of reasonableness, and that the errors were so serious that they resulted in a denial of the right to counsel guaranteed the defendant by the Sixth Amendment[.] Second,

the defendant must show that the deficient performance prejudiced the defendant. To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Wentz v. State*, 766 N.E.2d 351, 360 (Ind. 2002) (internal citations omitted).

There is a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. Counsel is afforded considerable discretion in choosing strategy and tactics, and these decisions are entitled to deferential review. Isolated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render representation ineffective.

*Id*. (quoting *Stevens*, 770 N.E.2d at 746–47 (citations omitted)).

## A. Closing Argument

Petty argues that his trial counsel was ineffective for stating in closing argument that the jury could not consider Petty's state of intoxication when he committed the crime. During closing argument, Petty's counsel stated the following:

We've talked about alcohol some in this case. The evidence has talked about it some in this case. Ah, but there's, alcohol's not a defense ah, you can't say that I took a candy bar ahm, I know I took the candy bar but I, I was intoxicated and therefore it's not my fault. But that doesn't mean that alcohol is not a factor or intoxication, I should say, is not a factor or a circumstance that you can consider ahm, in your, in this case.

Direct Appeal Tr. Vol. VIII pp. 12–13. In the final instructions, the trial court instructed the jury that "[v]oluntary intoxication is not a defense to the crimes charged. You may not take voluntary intoxication into consideration in determining whether the defendant acted knowingly or intentionally as alleged in the information." Direct Appeal Tr. Vol. VIII p. 70. Because the trial court also instructed the jury on voluntary intoxication and it correctly reflected the law, Petty has failed to establish that his counsel was ineffective, much less that he was prejudiced by his counsel's statement. *See Carpenter v. State*, 15 N.E.3d 1075, 1078 (Ind. Ct. App. 2014) (noting that jurors are presumed to follow the trial court's instructions), *trans. denied*, *see also* Ind. Code § 35-41-2-5 ("Intoxication is not a defense in a prosecution for an offense and may not be taken into consideration in determining the existence of a mental state that is an element of the offense unless the defendant meets the requirements of IC 35-41-3-5.").

## B. Witness Testimony at Sentencing

[8] Petty contends that his trial counsel was ineffective for failing to object to Pamela Murray Campbell's testimony at his sentencing hearing, who he alleges made a prejudicial victim-impact statement regarding a previous, unrelated crime he had committed, which the trial court used as an aggravating circumstance. At sentencing, Campbell testified regarding a 1999 robbery Petty committed, during which he pointed a gun at Campbell's head and demanded money while she was working at a store. Campbell also stated that the reason

for her testimony was that she "wanted to attest to [Petty's] violent nature, this was not his first violent act." Sentencing Tr. Vol. I p. 43.

[9] We conclude that Petty's trial counsel was not ineffective for failing to object to Campbell's testimony. Campbell was not a witness for purposes of making a victim-impact statement as Petty alleges, but, rather, to testify regarding Petty's criminal history and character, both of which were proper circumstances for the trial court to consider in sentencing Petty. *See* Ind. Code § 35-38-1-7.1(a)(2), (b)(8), *see also Yates v. State*, 429 N.E.2d 992, 993–94 ("A trial judge may consider almost any relevant information in determining what sentence to invoke."). Moreover, even assuming, *arguendo*, that Petty's counsel should have objected, Petty cannot establish prejudice. In sentencing Petty, the trial court only considered Petty's prior criminal history and the fact that he was on probation when he committed the instant offenses as aggravating circumstances, both of which were included in the pre-sentence investigation report. Petty has failed to establish that his trial counsel was ineffective in this regard.

## C. Improper Enhancement

[10] Petty contends that his trial counsel was ineffective for failing to object to the trial court's use of the elements of his obstruction-of-justice conviction to enhance the sentence for his removal-of-a-body-from-the-scene conviction. At the sentencing hearing, the trial court stated that

> On Count II it will be a total of 3 years none of that is suspended, with 3 years to be executed and Count II of course was removal of the body [from] the scene a class D felony and that will be run consecutive and of course it was a separate act and not only was it a separate act but and it is a violation of the law but the reason it is a violation of the law because of the harm that can result by removing a body from the scene and that is the destruction of evidence and in this case clearly it did cause a destruction of evidence it caused a lot of man power and it caused a lot of heartache for family and friends of this victim, not to know what happened for such a long period of time.

Sentencing Tr. Vol. II p. 49.

[11] Petty's contention fails for multiple reasons. First, as stated in its sentencing order, the trial court considered only Petty's criminal history and the fact that he was on probation when he committed the instant offenses as aggravating circumstances in enhancing his sentence. Second, Petty's obstruction-of-justice conviction was based on his burning of the victim's clothes and disposal of her cellphone, not the removal of her body. Petty has failed to establish that his counsel was ineffective in this regard.

## D. Displeasure with Jury's Verdict

[12] Petty contends that his trial counsel was ineffective for failing to object to the trial court's alleged displeasure with the jury's verdict. At the sentencing hearing, the trial court stated

> Mr. Petty as a Judge I here [sic] many cases, I have been at this for twenty years and every case is different and I try to keep an open mind about every as I am required by law to do but also

because that's I've learned appropriate because so often you hear things that you don't anticipate and sometimes what you think you know you change your mind as you go through this and as I first heard about your case and as I've learned more about it, I have to agree with everyone that this is a tragedy we all have assumptions about this case and what happened but unfortunately I don't know if any of us really know what happened because of the things that you have been convicted of doing and in fact when you talk to the police each time your story was somewhat different every time, sometimes much different and so I don't know if you in fact have fabricated all of the circumstances that might make it look as if this was all done in sudden heat. I don't know, I just am not sure about any of those things. The Jury was left with a difficult decision and the way they resolved the decision is what determines what I'll sentence you on today and so my role in this of course is limited some what by the statute[s] say.

Sentencing Tr. Vol. II pp. 46–47. Our review of the trial court's statement does not reveal displeasure with the jury's verdict, but, rather, the trial court's understanding that its sentencing authority was confined to the offenses for which the jury found Petty guilty. Petty has failed to establish that he received ineffective assistance of trial counsel.[1]

---

[1] Petty also seemingly argues that the trial court's statement also reveals that it failed to consider sudden heat as a mitigating circumstance in sentencing him. While the jury's finding of sudden heat resulted in Petty being convicted of the lesser-included voluntary-manslaughter charge rather than murder, it does not entitle him to mitigation in his sentence for his voluntary-manslaughter conviction. *See Bane v. State*, 587 N.E.2d 97, 100 (Ind. 1992) ("Sudden heat is an evidentiary predicate which allows the mitigation of a murder charge to voluntary manslaughter.").

# II. Ineffective Assistance of Appellate Counsel

[13]     We evaluate an ineffective assistance of appellate counsel claim by applying the two-part test articulated in *Strickland v. Washington*, 466 U.S. 668 (1984). *Carter v. State*, 929 N.E.2d 1276, 1278 (Ind. 2010). Petty contends that his appellate counsel was ineffective for failing to challenge (1) the admission of Campbell's testimony at his sentencing hearing, (2) the trial court's use of the elements of his obstruction-of-justice conviction to enhance the sentence of his removal-of-a-body-from-the-scene conviction, and (3) the trial court's alleged displeasure with the jury's verdict. Given our previous conclusions that Petty's trial counsel was not ineffective for failing to object to these same three issues, we conclude that Petty's appellate counsel cannot have been ineffective for failing to raise the same alleged trial errors on appeal. Petty has failed to establish that he received ineffective assistance of appellate counsel.

[14]     The judgment of the post-conviction court is affirmed.

Najam, J., and Mathias, J., concur.